*3
 
 RufstN, Chief-Justice
 

 The Office of Cleric of the Superior Court of Law, for Lincoln county is claimed by Mr.
 
 Iloke,
 
 by virtue of his election thereto, under the act of 1832, c. 2 ; and his admission is opposed by Mr.
 
 Henderson,
 
 who claims the same office by virtue of a previous appointment thereto, under the act of 1806. The title depends upon the construction and validity of the
 
 ket
 
 of I832.
 

 The decision in the Superior Court was in favor of the old clerk, and is rested by tiie Judge who pronounced it, distinctly upon the ground, that the act is unconstitutional and therefore void.
 

 In support of the decision, it lias however been contended here, that it is not necessary, for the purpose of this controversy, to pass upon the correctness of the reasons of the Judge of the Superior Court ; for that the act does not, in terms and according to a proper construction, oust the defendant from office.
 

 It is true, the act docs not immediately vacate the offices which were filled at its passage; nor does it expressly remove the incumbents upon the future elections to be had under its provisions. The question is, whether that effect arises from the necessary or fair construction of those provisions taken together? In construing an instrument, the cardinal point is to ascertain the meaning of those who speak in it, from the words used by them and the objects apparently to be effected. This js the rule for the construction of statutes, as well as other instruments ; and it is the duty of the court, to whose province it falls, according to the distribution of the powers of Government in this country, to interpret statutes, to put a fair meaning upon the language of the legislature, in order to effect, as far as they are constitutionally allowable, the ends in view. If the words are ambiguous, and the evils to be remedied not apparent, or not specified, and the remedy not plainly designated, the effects and consequences of the one construction or the other, may, and ought to be resorted to as important aids to the expounder. If in one sense the en
 
 *4
 
 actments arfe reasonable, consistent with natural equity and a sound public policy; and if, in another sense, they invade private right, arc retrospective in their operation ,jn ¿[enouncjng punishments for acts not before criminal, or in divesting property secured by previous laws, and the guaranty of public faith — if they are repugnant to the natural sense of justice, subversive of the principles of sound legislation, and conflict with a wholesome policy long established and sanctioned by the tests of experience and common consent; and above alj, if they transcend the limits of the legislative authority as defined by the constitution — a court in such a caso would not only be warranted but bound to receive the former and not the latter, as the true meaning of the legislature, and to execute the act as thus interpreted. A decent respect for the legislature, and a knowledge of the imperfection of language, and of the difficulty of expressing the meaning in such exact terms as to convoy it with precision to the mind of another, would impose on the court the presumption as an' irresistible one, that general phrases of dubious import, were not used in the harsh sense attributed to them, to destroy existing rights, but in the milder one, (of which they are susceptible) of regulating the future actions of the citizen, and prescribing a new rule for the subséqnent acquisition or enjoyment of property.
 

 These considerations would induce the court cheerfully to adopt the construction of the act contended for by the counsel for the defendant, were there nothing more in itthan those parts on which he has animadverted. But there are other provisions, which arc absolutely inconsistent with this construction. To mention a few will be sufficient since they are decisive. The first section enacts that the sheriff and all persons holding elections at the next election for members of tlio general assembly, shall also hold an election for county and superior court clerks in the same manner, and under the same miles and regulations that they receive votes for members of the legislature. The fourth section enacts that the clerks thus elected shall at the first term of their respective courts, which shall hap
 
 *5
 
 pen after their election, execute bonds for the faithful discharge of their duties, and take the oaths of office. It is thus seen that the enactment is, not that the elections thus to be held, shall be from time to time thereafter in each county, as a vacancy shall occur ; but that a p¿ll shall be opened at the then
 
 next
 
 general election, by
 
 all
 
 persons holding the elections for members of assembly. Indeed no provision is made for any future election, not even one at the end of the four years, the prescribed term of service. In the event of a vacancy after one election, the court is authorised to fill it, and the person appointed is to remain in office until the next annual election of members of the assembly,
 
 or
 
 the first term of the court of pleas and quarter sessions thereafter; but even in that case, the persons who shall have the right to vote are not designated, nor is any person authorized to receive the votes. The very imperfection of the act in making no provisions for subsequent elections, proves that tlic great, almost the sole end of it, was an election to follow its passage almost immediately, in every county in the state; as the words of the first section in themselves impart. It is however said, tha the act does not remove the existing
 
 clerks;
 
 and it is asked when their offices become vacated — at the passage of the act, at the election ? at the qualification of the person elected ? or at the next court t The answer is, that upon the grounds of the public service and the silence oí the act upon the subject of removals, the’ offices could not, by construction, be deemed vacated until, according to the other provisions, another officer was ready to discharge the duties, or, at least the time had arrived for him to enter on them. But by a necessary implication, when that time should arrive and the new clerk, whether elected by the people, or appointed by the court, should have given bond and taken the oaths, the duties of the former clerk closed, and consequently, his rights as recognized in the act, also terminated. The admission of the new clerk is the expulsion of the old
 
 one;
 
 for both cannot be in at once, each having a right to the entire thing. Tims in every county a new clerk is to be elect-
 
 *6
 
 e(] aiu| admitted in 1833 ; and therefore all the former clet'ks are then ejected. This conclusion is unavoidable, as it seems to the court; and is the more to be re-j¡e(j on as jj. accords with the general sense of the conw munity, evinced by the elections held throughout the state finder the act. In not a single county was an election
 
 omitted;
 
 nor have any scruples been before expressed that they were held in conformity to the requirements of the legislature.
 

 In executing such a statute a court is not at liberty to disregard or evade its mandate upon any of the grounds, upon which are formed the rules for the interpretation of general terms of ambiguous import. These are rules for discovering the meaning of the legislature, and not a justification for disobeying it. It is the province of the court to expound their words so as to attain to the meaning; and to that end consequences and policy may be looked to. But when its meaning is discovered, the act as really intended,.is obligatory upon the mind the will and the conscience of the judge, however mischievous the policy, harsh and oppressive in its enactments on individuals, or tyrannous on the citizens generally. Those are political considerations, fit to be weighed by and to influence the legislators ; but if disregarded by them, their responsibility is to their constituents, not to the courts of justice. To a court the im-policy, the injustice, the unreasonableness, the severity^ the cruelty of a statute by themselves merely, are and ought to be urged in vain. The judicial function is not adequate to the application of those principles, and is not conferred for that purpose. It consists in expounding the rules of action prescribed by the legislature ; and w hen they are plainly expressed, or as plainly to he collected, in applying them honestly to controversies arising under them, between parties, without regard to the parties or the consequences.
 

 In the act under consideration, as far as it concerns the controversy between these parties, there is no ambiguity : the words are plain, the intention unequivocal, and the true exposition infallibly certain. We cannot,
 
 *7
 
 under tbe pretence of interpretation repeal it, and thus usurp a power never confided to us, which we cannot usefully exercise, and which we do not desire.
 

 It is competent for the judiciary to declare an Act of Assembly to be unconstitutional and void.
 

 Since the meaning of the act cannot be doubted, and according to that meaning Mr.
 
 Henderson
 
 had not, but Mr.
 
 Hoke
 
 had the right to the office of clerk at the time the judge refused to admit the latter, the ground of the decision of the Superior Court, as stated in the record, recurs before this court, and must now unavoidably be examined.
 

 The act transfers the office of clerk from one of these parties to the other, without any default of the former, or any judicial sentence of removal. The question is, whether this legislative intention, as ascertained, is valid and efficacious, as being within the powers of the legislature in the constitutions of the country ; or is null, as being contrary to and inconsistent with the provisions of those instruments. To the determination of this question the judicial function is competent. It involves no collateral considerations of abstract justice or political expediency.
 
 It
 
 depends upon the comparison of the intentions and will of the people as expressed in the constitution, as the fundamental law, unalterable except by the people themselves, with the intentions and will of the agents chosen under that instrument, to whom is confided the exercise of the powers therein delegated or not prohibited. Such agents are all public servants in this state; and tbe agency is necessarily subordinate to tbe superior authority of the constitution, which emanated
 
 directly
 
 from the whole people. Legislative representatives may order and enact what to them may seem meet and useful, upon all subjects and in ail methods, exeept those on which their action is restrained by the constitution ; and such order and enactment is obligatory alike on all citizens, including those who are by a public duty to execute the laws, as well as those on whom they are to be executed. Courts therefore must enforce such enactments ; for they are laws to them by the mere force of the legislative will. But when the representatives pass an act upon a subject upon which the people have
 
 *8
 
 said in the constitution, they shall not legislate at ali or when upon a subject on which they are allowed to legislate, they enact that to be law which the same instrument says shall not be law, then it becomes the province of those who are to expound and enforce the law's, to determine which will, thus declared, is the law. Neither the reasons which determined the will of the people on the one hand, nor the will of the representatives on the other, can he permitted to influence the mind of the judge upon the question, when reduced to that simple point. His task is the humbler and easier one of instituting a naked comparison between what the representatives of the people have done, with what the people themselves have said they might do, or should not do
 
 ;
 
 and if upon that comparison, it bo found that the act is without warrant in the constitution, and is inconsistent with the will of the people as there declared, the court cannot execute the act, but must obey the superior law, given by the people alike to their judicial and to their legislative agents.
 

 But'
 
 prima fa-cie,
 
 every act of the Legislature is within its authority, and is to be declared unconstitutional only in cases where no doubt exists.
 

 Although this function be in itself comparatively humble, and does not call for those high attainments required for wise legislation, which, as it affects all the diversified interests of society, ought to embrace a knowledge of all of them, and a just estimate of their relative importance to individual happiness and the common
 
 weal;
 
 yet the exercise of it is the gravest duty of a judge and is ahvays, as it ought to bo, the result of the most careful, cautious, and anxious deliberation. Nor ought it to be, nor is it ever exercised, unless upon such deliberation, the repugnance between the legislative and constitutional enactments be clear to the court, and susceptible of being clearly understood by all. In every other case, there is a presumption in favor of the general legislative authority, recognized in the constitution. The court distrusts its own conclusions of an apparent conflict between the provisions of the statute and the constitution, because the former has the sanctions of the intelligence of the legislators, equal to the apprehension of the meaning of the constitution, of their equal and
 
 *9
 
 sincere, desire, from motives of patriotism and conscientious duty, to uphold that instrument in its true sense
 
 >
 
 and of the present and temporary inclinations, at least, of a majority of the citizens, which must be supposed to be known to their representatives, and to be expressed by them. But even these sanctions are not sufficient to overturn the constitution, if the repugnance do really exist and is plain. For although the imputation is altogether inadmissible, that the legislature intend willfully to violate the constitution, and still less that the people themselves contemplate violence to the instrument consecrated by their own voices and the consent of our ancestors ; yet all men are fallible, and in the despatch of business, the heat of controversy, and the wish to effect a particular end, may inadvertently omit to scrutinize their powers, and' adopt means, adequate indeed to the end, but beyond those powers. It ought not to surprise that such an event should sometimes happen. In other countries, such has been the practical difficulty of limiting the action of those in whose hands the powers of government are, that the effort to do so has been tacitly yielded up, and the will of the governors for the time being, admitted to be the supreme law. In America, written constitutions, conferring and dividing the powers of government, and restraining the actions of those in authority, for the time being, have been established, as securities of public liberty and private u-ight. Still the agency of men is necessary to the operation of the government and the execution of its powers. The same frailties which cause, men in power, through .which they happen, in those countries where their own judgment and conscience arc their only guides and restraints, to enact laws unjust or oppressive, may here also be expected sometimes to have the same effects, although their acts should involve a violation of the constitution. It is astonishing that it does not oftener happen. That it does not, is a proof not only of the essential value of w’rittcn constitutions,' but of the profound wisdom with which, in ours, the powers of government are distributed; so as to secure in every department the
 
 *10
 
 agency of public servants, not only-capable of comprc-bending, but so solicitous of obeying the constitution, in its true spirit, that they will not palpably violate it, nor jncul> the danger of doing so by the exercise of doubtful powers. Such praise is not only due to the constitution for its wisdom, but the merit of scrupulously observing it must be allowed to those, who have been called to legislate under it, and have not, in the whole course of the legislation of nearly sixty years, been urged by passion or betrayed by carelessness hito the adoption of, perhaps, half a dozen acts incompatible with it. When, unfortunately, such instances do occur, the preservation of the integrity of the constitution is confided by the People, as a sacred deposit, to the Judiciary. In the discharge of that duty, the approbation of the Legislature itself is to be anticipated ; for the principle of virtue which restrains them from a known and wilful violation of it, will induce them to l’cjoice at the rescue of the constitution from their own incautious and involuntary infraction of it. It remains now to enquire, whether the act under consideration be of that character.
 

 The officéof clerk is recognised in the constitution ; but the tenure is not prescribed in any part of that instrument, and is doubtless, within the discretion of the Legislature. Very soon after the adoption of the constitution the act of 1777,
 
 {Rev. ch..
 
 115,) for the establishment of courts of law passed and provided, that the courts should appoint clerks of skill and probity, who should execute official bonds and take certain oaths of office ; and enacts in the fourth section,
 
 that the clerks so appointed shall hold their offices during their good behaviour therein.
 
 In 1806 a new law passed which established a superior court of law and a court of equity in each county, and provided that the judges should appoint clerks, and clerks and masters inequity, of skill and probity for the courts thereby established, who should be residents of the county at the passage of the act, and should continue to^reside within the same during their continuance in office, and be subject to the same rules, regulations and penalties as the' clerks, and clerks and mas-
 
 *11
 
 tors of tbo courts before established. — Under this law the defendant was in April 1807 appointed. The legal tenure of his office is therefore that created by the act of 1777, during his good behaviour therein, and, as additionally qualified by tbe act of 1806, during his residence in the county of Lincoln. He has not been found guilty of any misdemeanor in office, but has discharged its duties faithfully ; and it is not stated that lie has removed from the county, but that he was qualified and therefore still resides there. The act of 1832 removes him from office and confers it on the applicant.
 

 The great objects of society is to enable men -to appropriate among themselves the things which, in their natural state, were common. The purpose of the ordinary laws instituted by society, is to protect the right to the things thus appropriated to one individual, from the acts and wrongs of other individuals. Tbe right is yet exposed to the action of the mass of individuals composing the society
 
 ;
 
 ami against that there can be no effectual resistance, because it is sustained by physical force. There is nevertheless an intermediate power between that of an individual, or a few individuals on the one side, and the whole society on the other, from which danger to individual right may be apprehended. It is that power which resides in the person, or the body of persons, on whom is conferred the authority to act in the name and with the sanction of the supposed will of the whole community ; which may be observed and used, contrary to the will of the community, for the purposes of private wrong. The body possessing that power wo designate as the government of a country, whether it consists of one or more persons. The great and essential differences between governments, as distinguished from one another by their constitutions, consist in the greater or loss personal liberty of the citizen, and the greater or loss security of private right, against the violence or seizure of those who are the government for the time being. It is true, the whole community may modify the rights which persons can have in things, or at their pleasure, abolish them altogether. But when
 
 *12
 
 the community allows the right and declares it to exist, that constitution is the freest and best, which forbids the government to abolisli the right, or which restrains the government from depriving a particular citizen of it. In other words, public liberty requires that private property should be protected even from the government itself.
 

 don oftheBMof .Rights declaring
 
 *13
 
 that the Logisla-j^caf™ 0re ought to he ^“¡tinct, deprives this State of all judicml power.
 

 
 *12
 
 The people of all countries who have enjoyed the semblance of freedom, have regarded this and insisted on it as a fundamental principle. Long before the formation of our present constitution it was asserted by our ancestors on various occasions ; and, in one sense of it, its vindication produced the revolution. At the beginning of that struggle, while the jealousy of power was strong, and the love of liberty and of right was ardent, apd the weakness of the individual citizen against the claims of unrestricted power in the government was consciously felt, the people formed the constitution of this state; and therein declared “thatno freeman ought, to be taken, imprisoned or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner destroyed, or
 
 deprived
 
 of his life, liberty or
 
 property,
 
 butby the law of the
 
 land.”
 
 — [Bill
 
 of Rights
 
 s.10.) By the fourth section it is declared, “ that the legislative, executive and supreme judicial powers of government ought to ho forever separate, and distinct from each other.”
 

 In absolute governments, whether hereditary or representative, the division of the powers of government is unimportant; oecause that body in which resides the superior authority can, at will, make it supreme and absorb all the other departments. It does not follow, therefore, that because the British Parliament, whose supremacy is acknowledged, decides questions of private right and puts that decision, as it does its other determinations, into the form of a statute, that whatever it does is legislative in its nature. It can adjudicate and often does substantially adjudicate, when it professes to ena°t new laws. That faculty is expressly denied to our Legislature, as much as legislation is denied to our
 
 *13
 
 Judiciary. Whenever an act of the Assembly therefore is a decision of titles between individuals, or classes of individuals, although it may in terms purport to be the introduction of a new rule of title, it is essentially a judgment against the old claim of right : which is not a legislative, but a judicial function. It may not be easy to distinguish those powers and to define each, so that an act shall be seen at once to be referable to the one or the other. But I think, that where a right of property is acknowledged to have been in one person at one time, and is held to cease in him and to exist in another, whatever maybe the origin of the new right in the latter, the destruction of the old one in the former is
 
 by sentence,
 
 If the act of 1832 had been confined in its terms to the clcrkship of Lincoln, its judicial character would bo ob vious. If it had said, that Mr.
 
 Henderson
 
 had forfeited his office, or had conveyed it to Mr.
 
 Hoke,
 
 or that after forfeiture Mr.
 
 Hoke
 
 had been duly appointed, or was by that act appointed, or had been elected by the citizens and was approved by the legislature; and therefore the one should go out and the other go in : it would bo plainly as respects Mr.
 
 Henderson’s
 
 title, an adjudication against it, although the subsequent investment of the title in Mr.
 
 Hoke
 
 would be legislative. Is the act the less of the former character, because it does not recite an abuse by
 
 Henderson,
 
 or other cause of forfeiture ? Is not such forfeiture assumed in it ? For it is impossible in the nature of things» that Mr.
 
 Hoke
 
 can be rightfully put in, unless the other be rightfully put out; and Mr.
 
 Henderson
 
 cannot rightfully be deprived, unless the thing he claims was never property, or has ceased to be so, or unless ho has parted from the property he had in it, by forfeiture or otherwise. This act however is not restricted to one county, but applies generally to all the clerks in every county ; and it is said that, for that reason, it cannot be a judicial act. It certainly in that light is wanting in the precision and direct operation usually belonging to, and distinguishing judicial proceedings. But nevertheless it partakes of that character in its operation on the former officers. If valid, it compels
 
 *14
 
 the courts to deprive the officers without further enquiry before a jury, into the fact or legal sufficiency of any cause of forfeiture or removal. If the Legislature cannot itself adjudge a forfeiture directly ; still less it would seem, ought they to command the courts to remove without any cause whatever. Nor does the extension of the sentence of expulsion to all the Clerks in the State vary its character in this respect. The provision is not that of a law prescribing a rule of property, or modifying the. extent of interest or the tenure
 
 prospectively,
 
 of which these offices shall be susceptible, or declaring that all property in them shall cease by the abolition of the offices themselves ; but it is a provision, by which the office, preserved in the law and still regarded as the subject of property, is taken, and merely taken from one man and given to another. The only sense in which that transaction cannot be called judicial is, that no court of justice could have pronounced the judgment under the existing laws upon the state of facts in this case. To have authorised such a sentence by a court, further legislation would have been necessary. It is true then, that the. act is not purely judical. But thi,s is all that can be said in support of it. It is certainly' as true that it is not purely legislative ; for it leaves the nature of the office as it was, in duties, powers, privileges and emoluments, and confers it on one person, as a lucrative place,
 
 after taking it from the former possessor, who was before the acknowledged owner.
 
 As far as the act is legislative, it is within the legitimate powers of the General Assembly ; and it must be admitted, that the elections allowed or commanded by it arc constitutional and valid, and confer a good title on the persons elected, where a vacaney existed ; and it may perhaps be admitted that they are also valid and confer a title, whenever the pre-existing rights of the incumbents shall expire by lapse of time, or cease by surrender, or by forfeiture for any cause declared by law.
 

 
 *13
 
 A determina-iighí between2 two classes of per-sofs 1S|a judicial act, although pro-nouneed in the of a stay
 

 its terms^flect its charactof.
 

 
 *14
 
 Thaact of 1832 does not modify the tenure of the office of clerk; neither does it affect the interest of the ineumbents, but leaving the office and its privileges untouched,it directs the Courts to remove one class of individuals without a trial, and induct another, it is then judicial in its character and effects.
 

 The question is not now upon the validity of the title un ? der the new elections to the office, if vacant, or when it shall in future, become so; but upon the right claimed under it to
 
 *15
 
 immediate induction, notwithstanding the office is already full by a previous legal appointment of another person. To sustain this claim the previous appointment must be vacated, or the officer adjudged out. When the act proceeds to do this, it becomes, in that respect, an adjudication. Although it is not purely so in all its provisions, and may not in any be conclusively and definitively so, because it does not decide
 
 inter partes
 
 by name; yet it partakes of that nature, for the reasons already stated, and the prohibition of the constitution is as imperative against the assumption of the judicial power by the Legislature in combination with their legislative authority, as if the act were a single and simple one of direct adjudication. Creating a right or conferring it on one, when not already vested in another, is legislation. So prescribing the duties of officers, their qualifications, their fees, their powers and the consequences of a breach of duty, including punishment and removal, are all political regulations, and fall within the legislative province. But to inflict those punishments, after finding the default, is to adjudge ; and to da it,
 
 without default,
 
 is equally so and still more indefensible. The Legislature cannot act in that character; and therefore, although their act lias the forms of law, it is not one of those
 
 laws of the land,
 
 by which alone a freeman can be
 
 deprived
 
 of his
 
 property.
 

 sA
 
 legislative act which deprives one person of a right and vests it in another is not a “ iavr of the land” within the meaning of the Bill of Rights.
 

 Neither is one which professes to punish the citizen or to deprive him of his property without a trial according to the course of the common law.
 

 Those terms “ law of the land55 do not mean merely an act of the General Assembly. If they did,'every restriction upon the legislative authority would be at once abrogated. For what more can the citizen suffer, than to be “taken, imprisoned, disseized of his freehold, liberties and privileges; be outlawed, exiled and destroyed
 
 '•>
 
 and be deprived of his property, his liberty and his life,” without crime ? Yet all this he may suffer, if an act of Assembly simply denouncing those penalties on particular persons, or a particular class of persons be in itself, a law of the land within the sense of the constitution; for what is in that sense, the law of the land, mustbe duly observed by all, and upheld and enforced by the Courts. In referenco to the infliction of punishment and divest
 
 *16
 
 ing of the rights of property, it has been repeatedly held in this State, and it is believed, in every other of the Union, that there are limitations upon the legislative power, notwithstanding those
 
 words;
 
 and that the clause itself means that such legislative acts, as profess in themselves directly to punish persons or to deprive the citizen of his property, without trial before the judicial tribunals, and a decision upon the matter of right, as determined by the laws under which it vested, according to the course, mode and usages of the common law as derived from our fore-fathers, are not effectually <£ laws of the land,” for those purposes. Although in some instances the principle may have been.misapplied, yet it seems, in every case in which it hath come into discussion, to be admitted to be a sound one, and the true import of the constitution. It was early asserted in an anonymous case in 1
 
 Hay. Rep.
 
 29. It was acted on again in
 
 Den on dem. Bayard v. Singleton, (Marlin’s cases,
 
 48,) in
 
 1787;
 
 in which it was held that the act for conferring titles derived by purchase from the commissioners of confiscated property, which directed that suits • brought by claimants of such property should- be dismissed by the court on affidavit of the defendant, that lie was a purchaser from the commissioner, was void. It was elaborately considered in tiie case of the
 
 University v. Foy,
 
 (1
 
 Murph.
 
 58, 2
 
 Hay.
 
 310;) and declared again in
 
 Den on dem.
 
 of
 
 Hamilton v. Adams,
 
 (2
 
 Murph.
 
 161.) In
 
 Allen v. Peden,
 
 (2.
 
 Car. Law Rep.
 
 638,) it was distinctly decided, that an act of the Legislature emancipating a slave against the will of his owner, was plainly in violation of the fundamental law of the land and so void. And in
 
 Doe on dem.
 
 of
 
 Robinson v. Barfield,
 
 (2
 
 Murph.
 
 391,) that a deed of a married woman, not executed according to the existing law, did not pass the title to lands, notwithstanding an act of the Legislature passed after her death, enacted that it should be good and effectual for that purpose.
 

 The Mate
 
 v.
 
 -f
 
 1
 
 Hay. ‘¿9,J Hen v. Singleton, (Martin 48,J University v.Poy,
 
 (1
 
 Murph
 
 58, 2
 
 Hay. 310,) Hen
 
 v.
 
 Mams, (%Murph.\0\,) Hoe
 
 v.
 
 Hatfield, (lb.
 
 391J
 
 Allen
 
 v.
 
 Peden, (t Lato Hepos.
 
 638,^
 
 approved.
 

 It thus appears, that in respect to every species of corporeal property, real and personal, the principle has been asserted and applied. It has been adjudged, that
 
 *17
 
 the Legislature cannot seize the land or slaves of the citizen from him, and confer them on another, and in the case of
 
 Allen v. Peden
 
 it was applied in a remarkable maimer, and to the extent that the Legislature could not enact that the property in a slave should cease and exist in no person — upon the ground, I presume, that it was not a general provision for the extinction of slavery, but the depriving of a single citizen of his property without any motive of public utility, or view to general expediency.
 

 An office is the fncumtait 1 °
 

 The sole inquiry that remains is, whether the office of which the act deprives Mr.
 
 Henderson,
 
 is property. It is scarcely possible to make the proposition clearer to a plain mind, accustomed to regard things according to practical results and realities, than by barely stating it. For what is
 
 property;
 
 that is, what do we understand by the term ? It means, in reference to the thing, whatever a person can possess and enjoy by right; and in reference to the person, he who has that right to the exclusion of others, is said to have the property. That an office is the siibject of property thus explained, is well understood by every one, as well as distinctly stated in the law books from the earliest times. An office is enumerated by commentators on the law among
 
 incorporeal hereditaments ;
 
 and is defined to be the right to exercise a public or private employment, and to take the fees and emoluments thereunto belonging, (&
 
 Bl. Com.
 
 36.) A public office has been well described to be this: when one man is specially set by law, and is com-pellable to do another’s business against his will and without his leave, and can demand therefor such compensation,by way of salary or fees, as by law is assigned ; to the doing of which business no other person but the officer, or one deputed by him, is legally competent.
 
 (Carth.
 
 478,
 
 Leigh’s Cas.
 
 1
 
 Mumf. Rep. 475.)
 
 That the purpose of creating public offices is the common good is not doubt, ed. Hence, most of the rules regulating them have a reference to the discharge of the duties, and the promotion of the public convenience ; they are
 
 pro commodo populi.
 
 Hence they are not the" subjects of property in the sense
 
 *18
 
 0f that full and absolute dominion which is recognized in many other things. They are only the subjects of property, as far as they can he so in safety to the gene-raj ¡nterest, involved in the discharge of their duties— This principle demands that different rights of property should he recognized in different offices. It is one of the ordinary rights of property to alien and dispose of it at
 
 pleasure;
 
 hut that is inadmissible in public offices, because the public require a responsible person to an - swer for defaults. Besides, the power of alienation is not the test of property ; for doubtless, it is within the scope of legislative authority to restrict it or to deny it, —as in the laws which prescribe the ceremonies necessary to the validity of wills, or conveyances of infants and married women, and which deny altogether the power of conveying, and which interdict all conveyances made in
 
 mortmain.
 
 It is another ordinary right
 
 of
 
 property to have the power of substituting another person to manage it, or to let it lie idle and unmanaged. But the former is not allowable in some offices and
 
 the
 
 latter in none, The chief executive'office and judicial offices cannot be delegated, while subordinate ministerial ones may ; for there would be no security that, in the former cases the delegate would be competent, and no re* sponsibility of the superior would be adequate to answer ihe consequences; though in the latter it is otherwise. But
 
 non user
 
 is punishable in all public officers and, at the election of the public, is a forfeiture. So a misdemeanor or corruption in office may be punished by judicial sentence in any manner prescribed by,law, including a motion as fora forfeiture. These are all restrictions and penalties to secure the public service, which is the object in creating the office. But with these limitations and the like, a public office is the subject of property, as every other thing corporeal or incorporeal, from which men can earn a livelihood and make gain. The office is created for public purposes
 
 ;
 
 but it is conferred on a particular man and accepted by him as a source of individual emolument. To the extent of’that emolument it is private property, as much as the land
 
 *19
 
 which he tills, or the horse lie rides or the debt which is owing to him. Between him and another man, none will deny the right of property. For if one usurp an office which belongs to another, the owner may have an action for damages for the expulsion, for the fees of office received, and a remedy by
 
 quo warranto
 
 to enquire into the right of the usurper, and by
 
 mandamus
 
 to be himself restored. When we find these remedies established'to enforce the right of admission into office, to secure the possession of it and its emoluments, we can no longer doubt that in law, an office is deemed the subject of property and valuable property to the officer, as well as an institution for the convenience of the people. If it be so, it falls within those provisions of the constitution which secure private
 
 interests;
 
 and cannot be divested with-’ out some default of the officer, or the
 
 cesser
 
 of the office itself.
 

 In the absenpe airestrktimfthe creation, continu Súmente ofd
 
 *20
 
 an office ave mat-expediency ^and to be judged of gisfafum fllG Le"
 

 
 *19
 
 These are the general principles that lead the court to the conclusion that the act of Assembly is invalid.
 

 In opposition to them, several arguments have been urged, which the court has anxiously considered ; but without
 
 n
 
 change of opinion.
 

 It was principally urged, that, whatever may be the Hilo of the common law. yet in this country and under our republican institutions, public offices cannot be admitted to be private property ; but the offices must be regarded as created solely for the public use, and therefore as subject to abolition when required by the general interest, of which the Legislature is exclusively to judge. This argument was illustrated by the additional observation, that by the contrary doctrine, a system requiring officers for its execution, once fixed, would be un-changeably permanent: the absurdity of which was strongly insisted on and proved by the various changes in our judiciary system; which have all been acquiesced in, without a scruple of their constitutionality.
 

 The court does not perceive the least reason to doubt the validity of any one of those laws; nor to question any part of the propositions stated by the counsel, except that offices cannot be the subjects ofprivatc property.
 
 *20
 
 Undoubtedly, the creation of an office is a question of political expediency; so is the qualification of the officer; and so are his duties, perquisites, punishment, and the tenure by which he holds his office. By consequence, they arc the subjects of legislative regulation. And as ^ie creati°m so is the continuance of the office, a question of sound discretion in the Legislature ; of which a cour* cannot question the exercise. If the Legislature increase his duties and responsibilities, or diminish his emoluments, he must submit, except in those cases in which the constitution itself has declared the duty and fixed the compensation; because, in the nature of things, those are the subjects of such regulations as the general welfare may from time to time dictate, and the office must therefore have been conferred and accepted, subject to such regulation. The Legislature is charged with the duty of securing the rights of suitors, and of all persons who have their business done only by the clerks, against loss through the person thus appointed by the law, as well as with the duty of securing a reasonable compensation to the officer for his time and labor. It is competent therefore to call for large official bonds and to in* crease or diminish the fees;
 
 for all that concerns the interest of the community at
 
 large. So also it is yielded, for the like reasons, that the office itself, when it ceases to be required for the benefit of the people, may be abolished. There is no obligation on the Legislature or the people to keep up an useless office, or pay an officer who is not needed. He takes the office with the tacit understanding, that the existence of tire office depends on the public necessity for it; and that the Legislature is to judge of that.
 

 But while these postulates are conceded, the conclusions drawn from them, cannotbe admitted. They are, that there cannot be private property in public offices; and if there be, that the officer may be discharged at llie discretion of the Legislature. Neither of these propositions is believed to be correct. The former has been already considered at large; and to what has been said may be added the provisions in our own constitution
 
 *21
 
 .. .... Yet it ÍS quite a (lit-guaranteeing adequate salaries to certain officers, and declaring tliat no person shall hold more than one
 
 lucrative
 
 office at one time. The latter by no means follows from the premises. It may be quite competent to abolish an office; and true, that the property of the officer is thereby, of necessity, lost. ferent proposition, that although the office he continued, the officer may be discharged at pleasure, and his office given to another. The office may be abolished, because the Legislature esteem it unnecessary. The common weal is promoted by that law ; at least, it is the apparent object, and must be deemed to be the real one.— But while the office remains, it is not possible that the public interest can be concerned in the question, who performs the services incident to it. The sole concern of the community is, that they should bo performed, and well performed, by some body. That they should be done by one particular person more than by another, is not therefore a matter of expediency, in any sense; and hence it cannot be the subject of legislation, that one man, who has the faith of the public pledged to him, tliat he should have the employment for a certain term, and who has, upon that faith, entered upon the employment and faithfully executed it, should be deprived of it and supplanted by another man, who is to do, and can do the community no other services than those already in a course of performance by the former. It is true, that a clerk, like all other officers, is a public servant; but he has also a private interest. He is not merely a public servant and political agent. If he were, and had no interest of his own, he might be discharged at pleasure. The distinction in principle, between agencies of the two kinds, is obvious. The one is for the public use exclusively, and is often neither lucrative nor honorary, but is onerous. To be deprived of such an office is often a relief, and never can be an injury. The other is fer the public service conjointly with a benefit to the officer. To be deprived in this last case is a loss to the officer. If it arise by the destruction of the office, it is a loss without an injury ; because the right of the officer
 
 *22
 
 js necessarily dependant upon the existence of the office, as an establishment in the political economy oí the country. But if it arises from the transfer of the emolu-nients, the loss then becomes an injury; because that which belongs to one man, as a thing not simply of ideal but of real value, is taken from him and given to another. The distinction which I am endeavoring to express and explain, may be fully exemplified by the difference between the public agency
 
 exercised in
 
 appointing a clerk, and that exercised in discharging the duties of a clerk. By the law the judges of the Superior Courts and the justices of the County Courts were athorised to appoint the clerks of their respective courts. That power is an
 
 office
 
 in the extended sense of that word, which originally signifies
 
 duty,
 
 genex-ally; but
 
 it is
 
 not a lucrative or a valuable office. It was a duty to be performed exclusively for the public convenience, and with reference to it alone, without any benefit, immediate or remote, to the judges and justices as individuals who were required, by oath, not to make any private advantage from it, but to give their voice for the appointment of only such persons as appeared to them to be sufficiently qualified, and to do that without reward or the hope of it, or any private motive whatsoever. The courts were in this respect, not exercising a judicial function, nor serving for emolument, but were the mere ministers of the law, arid naked agents of the body politic to effect an end purely public. Such political agents the legislature can discharge, whenever it shall appear to them that the end can be better effected through other' agents. But when the country has through those agents appointed a person to the office of clerk, though he also is a servant of the public, yet he is something more than a naked, uninterested, political instrument. For the term for which the law assures the
 
 office to him, he
 
 claims and can claim, to continue to be the agent of the public to discharge the duties of that place, while there are duties remaining to be discharged, and he is ready and willing to perform them. Nor is there any thing in our constitution, the form or nature of our government, to
 
 *23
 
 change the character of this right. There is no reason why a public office should not be given during good behavior. The services are what concern the country; and they may he expected to be best done by those, whose knowledge of them, from time and experience, is most extensive and exact. Some offices can under the constitution, be granted or conferred for no other term but that of good behaviour. Such is the provision respecting the office of a judge and justice of the peace. Certainly that is not introduced solely for the benefit of the persons holding those offices, but upon the great public consideration, that he who is to decide controversies between the powerful and the poor, and especially between the government and an individual, should be independent,
 
 in the
 
 tenure of his .office, of all control and influence, which might impair his impartiality — whether such control be essayed through the frowns of a bad man, or through the adulation of an artful one, or such influence be produced by the threats of the government to visit nonconformity to their will, by depriving him of office, or rendering it no longer a means of livelihood. For these reasons the Constitution has fixed the tenure of the judicial office to be during good behavior. The people have said, that the liberty and safety of the citizen required that it should not be held upon any other tenure. It is clear therefore, that our ancestors did not entertain the notion that such a tenure was not consistent with our institutions generally. It is true, that it does not put clerks upon the same basis. There was not the same reason for it. The public interest did not require that any law should be laid down to the Legislature as to the tenure of those offices; but it was left to their discretion, as expediency might from time to time require it to be altered. It was therefore in the power of the Legislature to confer such offices for life, or during good behavior, or during pleasure, or for any term of years, determinable with
 
 life at an
 
 earlier day. For an absolute term of years it could not be granted ; as upon the death of the officer, it would in that case go to •his executor, which would be inadmissible, since the of-
 
 *24
 
 flce concerns the admistration of justice, and an incom* petent person might be introduced into it. It however pleased the legislature to make the tenure, during good behaviour. When they did so, it was quite within their competency to alter it subsequently. But such alterations must operate prospectively, and as regulations for future appointments and future enjoyment. As to those to whom the grant was made for life, an estate, a property vested ; which cannot be divested without default or crime.
 

 
 *21
 
 But it cannot continue an office, and oust the incumbent, and transfer ids right t0 another,
 

 tw^tlbe" which are mere which a personal “^ecf The first may be vacated at an? tíFe’ tlle conviction for default.
 

 
 *24
 
 tedby stSutemay be destroyed by but itcTOnotcrai-tmue the office, the tenure ÓTthe incumbent, or another 14 *°
 

 This course of reasoning in some degree anticipates some other arguments urged for the plaintiff; which however it may be more becoming to state distinctly and consider more particularly.
 

 It was said, that as the tenure was necessarily at the will of the legislature, he who took the office received it subject to such alterations of tenure, as well as of duties and emoluments, as the legislature might prescribe : And the distinction between the tenure of the judicial office, as being constitutional and unalterable, and that of a clerk, as being statutary and therefore alterable, was strongly urged.
 

 The distinction is admitted; but not the argument derived from it. The constitution restrains the legislature from appointing a judge or justice of
 
 the
 
 peace, ex-ceP^ during good behavior. It does not restrain them in respect to a clerk; but allows that office to be given ^or a longer or a shorter term, as may be most expedient. The question is, what is the effect of a grant for a Particular period ? Can the duration be afterwards lessened to the prejudice of a grantee ? We think not; because he acquires a property. That it may be lessened in reference to new appointments cannot be contest* ed; but that it can, in respect to existing ones, involves the propositions already discussed,, that an office is not the subject of private property, and that private property may be seized without judicial sentence, and even without compensation. This property does not differ from that in other subjects, as far as it is allowed at all.. In lands there may be estates in fee, for life, or for years.
 
 *25
 
 The Legislature may grant tlie public domain in any of those estates ; but if it please them once to grant it, the grant is irrevocable and. the estate cannot be re-sumcd. It becomes the land of a, citizen and cannot be taken from him by a law, without the action of his peers as a jury to pass on the facts, and of a court to determine the title. It is further said, that the distinction between these offices as derived from the constitution and a statute, is exhibited in the power to alter the compensation : That the clerk must be considered as holding office at the will of the Legislature, while the fees depend entirely on their pleasure; whereas a judge, who holds his office independent of that will, is necessarily entitled to his salary, as stipulated to be paid to him. Upon this latter proposition, a person in my situation cannot be expected to express, and cannot properly express an opinion. But taking it to be true, it does not establish the point to which it is adduced. If it be true,.it arises as an incident to the independent tenure of the judicial office fixed by the constitution. No such object was in view in respect of a clerical office. All that is intended is, that the Legislature shall allow such fees as are adequate to the livelihood of the clerk, and as a compensation for his labor. It is supposed that a sense of justice will ever influence the Legislature to do this, and if not, that the public interest will. For this argument assumes that the office is still, necessary to the public convenience, and continues, by law, to exist. Without a competent officer with a competent livelihood, the office must be unfilled, except by compulsion, and if occupied the duties will be unperformed. No danger therefore could have been apprehended, that the legislation on this subject would be unjust to the officer — who in the line of his official duty, can never be called to do an act which will render him obnoxious to the government, or the men of power of his day. Nor was the danger more to be expected, that the public interest would suffer by the Legislature not providing proper and sufficient oflices, in which the business of the citizens might be transacted ; and if such
 
 *26
 
 inconvenience should at any time arise, it could he only temporary, and would be redressed upon another election of representatives. The analogy between those offices jn this respect, does not therefore exist, as supposed
 
 ;
 
 and it may well be that the Legislature can regulate-the emoluments and prescribe the duties and" punishments of the clerk, without possessing the power of de- _ priving him of office, merely for the sake of bcnefitting another person.
 

 Nor do those powers, nor that of abolishing the office altogether, which are readily conceded to the Legislature, involve the further one of depriving the officer of his office, while it continues.
 

 It has been urged that it is vain and futile for the Court to refuse to execute this Jaw, and to uphold
 
 Mr.Henderson’s
 
 title, because if the Legislature be determined in their purpose, they can be still more unjust by destroying the office itself, or taking away the fees.
 

 There are several answers to that argument. The abolition of the office depends upon the necessity for it in the opinion of .the Legislature and of the people : if useful, doubtless it will be preserved ; and if it be not, private interest must yield to general convenience. But admitting it to be necessary, and that Mr.
 
 Henderson
 
 is constitutionally entitled to it during his
 
 good
 
 behavior, jt is not to be expected, nor apprehended — it cannoi be. imputed to the Legislature, that it will,
 
 for the indirect purpose of expelting by starvation,
 
 render the office more onerous, without adequate compensation, or take away the compcnsation altogether, while the duties remain as they are. If such a law were to pass, it would itself be unconstitutional — that being the object. If the pur-" pose were declared in the law in such terms, that the court could say, that the act was passed upon no other, the same duty would then be imposed on the
 
 court
 
 which we are now discharging. But if the law be couched in' general terms, so that the court, which cannot enquire into motives not avowed, could not see that the act had its origin in any other consideration but public expediency, and therefore would bo obliged to execute it.as a
 
 *27
 
 law; still it would not, in reality, be the less ilnconsti-tutional, although the court could not pronounce it so. It would be law, not because it ivas constitutional; but because the court could not see its real character, and therefore could not see that it was unconstitutional. It ■would not be constitutional as a provision, which deprives a citizen of his property; but it would beheld so, because we should be obliged to regard it as not haling such a provision. The argument is therefore unsound in this: That it supposes, (what cannot be admitted as a supposition,) the Legislature will designedly and wilfully violate the constitution, in utter disregard of their oaths and duty. To do, indirectly, in the abused exercise of an acknowledged power not given for, but perverted to that purpose, that which is expressly forbidden to be done directly, is a gross and wicked infraction of the constitution ; and the.more so, because the means resorted to, deprive the injured person, and are designed to deprive him of all redress, by preventing the question becoming the subject of judicial cognl* zancc. But that is not the only test of the constitutionality of an act of the Legislature. There are many laws palpably unconstitutional -which never can be the subjects of legal controversies. 'Not to allude to the causes which have been recently the themes of thebit-bittcrcst political controversies,several instances of much simplicity may be adduced from our State Government, The constitution of this state provides, that the Govern- or, Judges, Attorney-General, Treasurer, and other officers shall be elected by the General Assembly by ballot, and that certain of them shall have adequate salaries during their continuance in office. Suppose the Legislature to refuse to elect those officers; or to give them salaries; or, after assigning them salaries in a. statute, to refuse to lay taxes, or to collect a revenue to pay them. All tiieso would be plain breaches of constitu tional duty ; and yet a court could give no remedy, but it must be left to the action of the citizens at large to change unfaithful for more faithful representatives.— Yet no one will say, that the Legislature can by law
 
 *28
 
 remove the Governor, or a Judge, or any other head of a department, because they can unconstitutionally rc-fuse to provide salaries for them, and the courts cannot conipe} tjie raising of such salaries. Nor can it be said, because there cannot be such compulsion, that therefore the law is constitutional. All that can be said is, that such is the imperfection of all human institutions, that it is not possible to anticipate and provide against all vices of the heart, more than all errors of the head; and that after every precaution, much reliance must be placed in the integrity of our fellow men, and that such confidence is liable to be abused. ButI think it may safely be assumed, as is done in the constitution, with all the responsibilities of the legislative representatives to their constituents under frequent elections, with all tiie clear declarations of the rights of the citizen in that instrument, with the division of the powers of government made in it, whence arise the powers and the duty of the judiciary to ascertain the conformity of a statute with the constitution: that with all these guards against abuse, the danger of a wilful and designed violation, is
 
 never
 
 to be apprehended. No arguments therefore in favor of the necessity of executing a particular act, apparently inconsistent with the constitution, can be drawn from any supposed ability of the Legislature to effect the same end by indirect means, which are beyond the cognizance and control of the judiciary. When such an abuse shall occur, it will devolve on the people themselves to correct it, and not on us as a portion of their subordinate agents.
 

 I have omitted to consider in its proper place, another objection made by the counsel for the defendant, and must therefore now take notice of it. It has been said, that the obligation to continue in office ought to be mutual, to be complete, and that such is not the case, because the officer may at his pleasure resign. The argument on behalf of the power to discharge an officer assumes the right of the officer to discharge himself; and in that point differs entirely from the law as
 
 it
 
 stands, in the conception of the court. An officer may'
 
 *29
 
 certainly resign ; but without acceptance, his resignation is nothing and he remains in office. It is not true, that an office is held at the will of either party. It is held at the will of both. Generally resignations are accepted
 
 ;
 
 and that has been so much a matter of course with respect to lucrative offices, as to have grown into a common notion that to resign is a matter of right. But it is otherwise. The public has a right to the services of all the citizens, and may demand them in all civil departments as well as in the military. Hence there are on our statute book, several acts to compel men to serve in offices ; as the act of 1741, which inflicts a penalty-on one appointed a constable and neglecting or refusing to
 
 qualify;
 
 the act of 1777, which compels a sheriff to serve at least one year ; the various acts directing the appointment and services of overseers of the road ; and the recent statutes restraining certain militia officers from resigning under five years, and the like. Every man is obliged, upon a general principle, after entering upon office, to discharge the duties of it while he continues in office, and he cannot lay it down until the public, or those to whom the authority is confided, are satisfied that the office is in a proper state to be left, and the officer discharged. The obligation is therefore strictly
 
 mutual;
 
 and neither party can forcibly violate it.— If indeed the public change the emoluments of office, it is another question, whether that be not an implied per mission for the officer to retire at his election, unless the contrary be provided in the law : For I cannot doubt, that the Legislature has the perfect power, if it choose arbitrarily to exercise it, of compelling — not indeed a particular man designated in a statuto by name, but any citizen elected or appointed, as by law prescribed, to serve in office, even against his will. I have mentioned some instances in which it is done; and there is no reason why, making due compensation, it may not be done as to all offices. It is true, that non-user of an office is a forfeiture of it; and that is spoken of as a penalty and punishment in itself. But it is not the only punishment; and is a punishment only when the office is itself valúa
 
 *30
 
 blc. Such a forfeiture does not discharge the officer, but at the election of the sovereign
 
 ;
 
 for that would be to say, that an onerous office could not be conferred.'— The officer may be punished by removal for non-user, as a
 
 forfeiture;
 
 or he may be kept in office and punished personally, for non-user as a crime.
 

 It is lastly said, that it can be no injury to remove an officer : because the salary is taken to be but a just compensation for his time and labor, and when the public do not take the latter the officer can have no demand for them. This position is rather an artful than a solid or fair argument. It is true that to the officer is left the command of his own time, and the application of his own labor and the fruits of it. But it is not true that he does not suffer by being deprived. Of what is he deprived ? Of an employment — the immediate source of livelihood — the preparation for which has been the great business, it may be, of his life, to which he has served a long apprenticeship, and to which he has devoted himself, abandoning other lines of life, or other roads to fortune which were once open to his free
 
 choice.
 
 True, he is free to work at other employments ; but he is fit for none ; he knows but this. Ho is in the situation of one bred to the agriculture of our country, to ■whom the Legislature should say: Till the ground no more
 
 ;
 
 go and spin silk, or weave muslin.” His labor is not the subject of conscription; but he hangs a burden on. himself, because the only employment to Which he is competent is denied him. The loss is therefore undeniable. The only question is. w hether it be such an one as the Legislature can rightfully inflict.— We think, as already stated, that they may, if it bo merely the incidental consequence of a general law really passed for the purpose of abolishing useless offices, as a species of governmental institution. But that they cannot, if the offices are retained and the officer is deprived of his property therein, without default and without trial, for the single and sole purpose of giving it to another.
 

 It became the court to consider this subject dispas
 
 *31
 
 sionately in all its bearings. AYe have done so, without a desire to swerve to either side from the direct line of the law and the constitution, but with the utmost respect for the opinions and intentions of those from whom we differ. But having reached the conclusion above stated upon which no member of the court doubts, we are obliged to pronounce it as a duty not to be evaded
 
 ;
 
 and, being a known duty, we do so without reluctance, in support of the right of the citizen, and of the inviolability of the fundamental law of the land. The judgment of the Superior Court must therefore be affirmed.
 

 Per Curiam — Judgment at firme».
 

 The case of
 
 James Taylor
 
 v.
 
 Edward Stanly,
 
 on an appeal from the judgment of Settee Judge, at Craven was considered to be within the principle of the above.
 

 J. II, Bryan,
 
 for the plaintiff.
 

 Badger,
 
 for the defendant.
 

 Huitín, Chief-Justice. — The facts in this case are the same as in that of
 
 Hoke
 
 v.
 
 Henderson,
 
 except that Mr.
 
 Stanly
 
 was not appointed to office during good behaviour, but for the term of four years from the 4th Monday qf March 1832, under the act of1822, (Rev.-c. 1149.) His term was unexpired attlietimcMr.
 
 Taylor
 
 was elected, and applied to be admitted. Until its expiration his right was perfect; and the case falls within the principles discussed and established in the case just mentioned. The Judges of the Superior Courts however, entertained opposite opinions upon those principles, and upon the grounds on which the judgement in
 
 Hoke
 
 v.
 
 Henderson
 
 has been affirmed, that given in this cause must be reversed, and the title of Mr.
 
 Stanly
 
 declared valid, and ho restored to his office, and the same be certified to the Superior Court of Craven.
 

 Teh CuniA-r. — Judgment Rkvehseb