### STATE v. T. N. WOMBLE.

*Working on Public Roads—Exemption—Constitutional Law—Repeal by Implication.*

1. Section 25 of chapter 147 of Acts of 1852 which exempts the officers, servants and employees of the Fayetteville & Western Railroad Company (now the Cape Fear & Yadkin Valley Railway Company), incorporated thereby, from working on the public roads, is constitutional.

2. Such exemption being contained in a private act is not repealed by section 2017 of *The Code*, which requires all able-bodied male persons between the ages of eighteen and forty-five to work on the public roads, since by section 3873 of *The Code* it is provided that "no act of a private or local nature shall be construed to be repealed by any section of this *Code*."

CLARK, J., dissents *arguendo*.

This was an INDICTMENT for failure to work on the public road, tried at the February Term, 1893, of the Superior Court of CHATHAM County, before *Bryan, J.*

The jury returned the following special verdict: The defendant was a depot agent at Goldston, Chatham county, in the employ of the Cape Fear & Yadkin Valley Railway Company, and was duly summoned by the overseer of the road in the township to work the same, to which he had been assigned by the Board of Supervisors. Defendant received the summons, but failed to appear and work as required, and refused to pay any amount in lieu thereof, claiming that he was an employee of said company and in its actual service, and was exempt by its charter from work-ing the public road. Thereupon the Court held the defend-ant not guilty, and the Solicitor of the State appealed from the judgment rendered.

*The Attorney General* and *Mr. A. W. Haywood,* for the State.
*Mr. R. T. Gray,* for the defendant.

AVERY, J.: Conceding that the section in the charter of the "Cape Fear & Yadkin Valley Railway Company" which provides that the "officers, servants and employees of the corporation shall be exempt from the performance of ordinary militia duty, working on public road and serving on juries" (section 25, chapter 147, Acts of 1852; chapter 67, Laws of 1879) constituted no part of the con-tract between the State and the company, it remains to be determined whether that particular section has been repealed by the enactment of sections 2018 and 2059 of *The Code,* which declare that certain classes of persons and no others shall be exempt from liability to work on the public roads. Those provisions of the general road law are clearly repugnant to and operate as a repeal of that

portion of the charter which granted the exemption, unless the older statute was in contemplation of law "local or private in its nature" and was "saved from repeal" by sections 3867 and 3873 of *The Code. Shepherd* v. *Commissioners,* 90 N. C., 115. It has been settled that acts incorporating railroad companies are private statutes. *Durham* v. *Railroad,* 108 N. C., 399 ; *Hughes* v. *Commissioners,* 107 N. C., 598. But it is contended that the charter of a railroad company may contain some provisions of a public and some of a private nature, and that under a proper construction of the saving provisions cited in enacting *The Code* the Legislature repealed not the whole but every section of every railroad charter theretofore granted by the State which could be singled out and shown to operate upon the whole of the public. It would be difficult to foresee the effects of such a ruling upon the charters of public, *quasi* public and strictly private corporations in this State. The safer and more natural interpretation of the saving statutes is that private as well as local acts are, as a whole, and in every clause, unaffected by any repugnant provision of *The Code.* The language of section 3873 is that "no act of a private or local nature  *  *  * shall be construed to be repealed by any section of this *Code,*" as we think, in whole or in part. Any other construction would involve an endless scrutiny of both municipal and railroad charters to ascertain how much of every particular one is still left intact. The fact that so much of a private act as creates a criminal offense applicable alike to all citizens of the State is so far public that the Courts will take judicial notice of its existence without offering it in evidence, is not inconsistent with a purpose on the part of the Legislature to save from repeal, not simply certain sections, but the whole of an "act of a private nature." If the charter of the North Carolina Railroad and that of the

Atlantic & North Carolina Railroad are private acts, as both have been held to be (*Durham* v. *Railroad* and *Hughes* v. *Commissioners, supra*), then that under consideration is also a private statute, and all three from beginning to end remain unaltered by the repugnant provisions of *The Code.*

It is true that section 2017 of *The Code* constituted a part of chapter 82, Laws of 1879 (being section 4), and that by section 12 of said chapter all laws and clauses of laws in conflict with its provisions were repealed. But it does not necessarily follow that the effect of that statute was to establish a sweeping rule without any such exception as had been previously made by law. The very next section (2018), which then constituted a part of the Revised Code, provided that "no persons between the ages prescribed shall be exempt, except such as shall be *exempted by the General Assembly* or the board of supervisors," etc. *The Code* Commissioners, finding no conflict between the two sections, brought forward both, yet, if the Act of 1879 is to receive the construction contended for, there could be no exception, not even when the General Assembly had specifically declared certain persons exempt. When the charter of the railroad company was granted in 1858 the Revised Code, ch. 101, sec. 9, made it the duty of the overseer to "summon all white males between the ages of eighteen and forty-five," etc. (the Act of 1879 being a re-enactment of it), and a subsequent section (112) of the same chapter excepted (just as *The Code*, §2018, has done) all such persons as "shall be exempted by the General Assembly." By reference to the Revised Statutes, ch. 104, secs. 10 and 12, we find the same provisions, first, that "all males between eighteen and forty-five" shall be summoned and shall be liable to a penalty for failing to work, and second that no person shall be excused, except such as are or shall be exempted by the General Assembly, etc. By going still fur-

ther. back to the fountain-head it appears that those two sections of *The Code* (§§2017 and 2018) were enacted in the years 1784 and 1786, the first being substantially the same as section 3, chapter 256, Acts of 1786, and the second the same as section 8, chapter 227, Acts of 1784, the later of the two being by its terms merely amendatory of the former. 1 Potter's Revisal, chapters 227 and 256. So at every stage of the history of legislation on this subject, by construing all the statutes in force together, and giving effect to all laws in existence, we reach inevitably the conclusion that the statutory general rule has at all times made all such persons between eighteen and forty-five liable, but the exception has kept pace with the rule and has provided for the exemption of such as had been or should be, by any special legislation or by the action of the county authorities for certain specified reasons, excused. It is clear that the charter was enacted in 1858 in the face of the same sweeping rule, followed by the same exception (of "such as shall be exempted by the General Assembly," etc. Revised Code, ch. 101, secs. 9 and 12) as in the present *Code*, the two having stood together in perfect harmony since 1784, and the immunity given was manifestly intended to be placed, and to stand until repealed, within the exception.

The Legislature of 1879 re-enacted section 9 and declared all clauses inconsistent with it repealed. Does it follow that section 12 was thereby repealed? If they were repugnant, as is contended, how could they have been left standing in the Revised Code as sections in the same chapter and on successive pages? Not only did the eminent men who codified the laws in 1855 consider them consistent with each other, but the Commissioners, in 1883, upon reviewing the history of legislation upon the subject, brought forward both as a part of the existing statutory law and recommended a re-enactment. In construing the law both

Commissioners adopted the views of NASH, BATTLE and IRE-
DELL in bringing forward the same provisions from the Acts
of 1784 and 1786.   How, then, could the provision in the
charter be repugnant to a statute which has stood side by
side with another, specially excepting such provisions at
every moment of time from 1786 to 1883, when *The Code*
became the law?   End. on Inter. Stat., secs. 227, 228.

But it is contended that if the exempting clause was not
repealed by implication, it was nevertheless void *ab initio*
as a vain attempt to grant a special privilege to particular
persons.   Every presumption is in favor not only of the
constitutionality of laws passed by the Legislature, but of
the good faith of all law-making bodies.   Where, therefore,
it appears to have been within the purview of its power to
enact a law in order to effectuate a public purpose, the
Courts are not at liberty to question the motives of a
co-ordinate branch of the government.   Indeed, unless the
law itself declares the intent with which it was passed, it is
the duty of the Courts to enforce it as they find it enacted,
assuming that of several conceivable motives the lawful
one only operated to cause its enactment.   *State* v. *Moore*,
104 N. C., 714; 74 Am. Decisions, p. 595, notes; *Hoke* v.
*Henderson*, 4 Dev., 1; *State* v. *Moss*, 2 Jones, 66.

We take it for granted, then, that the purpose, in em-
bodying in the act the section exempting employees from
road duty, was to provide for the safety and security of
property and persons that might be transported by the com-
pany as a common carrier of freight and passengers.   It was
not only the right but the duty of the General Assembly, to
provide, to the uttermost limit of its power, ample protection
for passengers and property against exposure to unnecessary
risks as well as against injury from negligence.   *Bagg* v.
*Railroad*, 109 N. C., 279.

Were we to concede that in passing upon the constitutionality of a provision in one charter we are allowed to search the private as well as the public laws passed by the Legislature for the last fifty years to ascertain whether similar exemptions have been granted to employees of other *quasi* public corporations, and that such examination would reveal the fact that no such immunity from serving on juries or working on the public roads has been extended to the servants of any other company in the State, it would still be our duty to infer that on account of the peculiar location and environments of that particular line of railway it was necessary, in the opinion of the Legislature, for the public security that experienced operatives in its service should not be left liable to be detached on public duty and have their places filled by less vigorous or less skillful men. We can readily conceive that some such motive may have led to the exemption of lock-keepers, who were often stationed at remote points on the Dismal Swamp Canal, from military service, though no such immunity was granted to persons discharging similar duties on the canal of the Roanoke Navigation Company and other canals that were being used when the law was passed. *The Code*, §3164; Rev. Code, ch. 70, sec. 2. It is true that the law (*The Code*, §2059) afterwards enacted and still later repealed by Acts of 1887, ch. 93, sec. 4, excused from such service in all parts of the State all ferry-men, keepers of public grist-mills and lock-keepers on public canals; but the immunity was granted, not because the organic law imposed the duty of including the whole of a class, but because in the judgment of the Legislature the public interest and safety required that all of these persons should be at all times, as public servants, ready to serve their customers. The width of public highways, except such as are causewayed or run through cuts, are required to be kept clear of obstructions to the passage

of vehicles for the space of eighteen feet; but the roads lying in all counties, where by law they have been classified of different widths, as low as twelve feet, are excepted out of the act. These acts were passed in every instance because in the judgment of the Legislature the physical conditions in certain sections justified some peculiar legislation applicable to the highways situate within them. Surely the General Assembly is not restricted to county lines in adapting the laws to the "lay of the land," so that the same rule must be made to apply to swamps or plains as to mountains, constituting different sections of the same county. We would not be at liberty to question, because of unconstitutional discrimination, the validity of a statute exempting from military duty and liability to serve on juries the road workers assigned to a highway running across the hills and mountains or the swamps of many different counties. It would be our duty to draw the inference, in such a case, that a co-ordinate branch of the government had exercised its powers from the best motives and for the promotion of the public interest. While, except in cases of extraordinary damage to the highway, no person residing east of the Blue Ridge can be compelled to work on the public road more than six days in any year, those living west of that line, which runs through and divides many counties, may be required to work as many as ten days during the same period. *The Code,* §2017. It is the duty of the members of the General Assembly to inform themselves as to the condition and wants of the people in every section. If they deem it best for the public safety to extend the same exemption to the servants and employees of a particular *quasi* public corporation, as to ferry-men, lock-keepers and public millers, we must infer that the law was passed by them for the purpose of protecting life and property, just as the general statute was intended, either to attain the

same end or to avoid subjecting the patrons of the persons excused to inconvenience.

The charter confers no special privileges on a private individual or individuals as such, but exempts from a public burden the servants of an important public agency created by the Legislature for the benefit of the people, presumably to prevent the withdrawal of the exempt persons from their duties.    The Courts are not authorized to declare that their information was unreliable, their reasons for passing the act insufficient, or their motives improper. *Mayor* v. *Baltimore,* 74 Am. Dec., 572; *Hoke* v. *Henderson, supra* (25 Am. Dec., 677).

While the General Assembly has very frequently passed special legislation for particular counties, at the request of representatives of such political divisions, or for towns within them, it does not follow that any provision of the Federal or State Constitution fixes the boundaries of counties or any other geographical lines as criteria in determining the limit to the exercise of police power.    The test is involved in the question whether, from an examination of the act itself, it becomes manifest that the law was passed for the purpose of unjustly discriminating in favor of or against a particular person or class of persons or corporations, and not for the public good.    Every doubt must be resolved not only in favor of the constitutionality of the law, but of the honest intent of the law-makers.    Though, as a rule, a grant of a special privilege, not conferred upon persons generally, to a particular man for his own peculiar benefit, naming him, may be unconstitutional, the Legislature unquestionably has the power, in order to provide for the public convenience or to facilitate transportation of persons and property, to confer on a designated person the right to build a bridge or establish a ferry, with the power to charge tolls for the use of such crossings, and, in addi-

tion, to exempt the servant who may be placed in charge from all public burdens. It has never been contended that the Courts have the power, in passing upon the validity of such acts, to take judicial notice of every other private charter granted by the Legislature and declare ninety and nine unconstitutional because the grant of exemption is omitted in one. The power to institute condemnation proceedings and have private property appropriated to the use of corporations is an important privilege, in the exercise of which all of the people of the State owning land along the line are deeply interested; but it does not follow that the clause in a charter granting the privilege to one company to take one hundred feet on each side of the center of its track may be declared void because only fifty feet on either side is allowed to be condemned as a right of way by another similar corporation.

The grant of exemption does not purport upon its face to be exclusive. Upon its face, however, even if the exemption has not been granted to the employees of another corporation in the State, the act was one which the Legislature had unquestionably the right to pass.

We have hesitated to cite the case of *Bank of Newbern* v. *Taylor*, 2 Murphy, 266, because, though it sustains fully the principle we have stated, it goes much further in conceding the authority of the Legislature to give to a particular bank a summary remedy, not enjoyed by any other person or corporation, for the collection of debts. Judge HALL said, in concluding the opinion: "Although it is the duty of this Court when they believe a law to be unconstitutional to declare it so, yet they will not undertake to do it in doubtful cases. Mutual tolerance and respect for the opinions of others require the exercise of such power only in cases where it is plainly and obviously the duty of the Court to act. It is not for this Court to judge of the expe-

diency of the measure, nor to estimate its anticipated or actual benefit or injury to the community. These are considerations strictly of a legislative nature, and the competent authority has pronounced upon them."

We have preferred to rest the right of the Legislature to grant this exemption to a particular corporation, not upon the ground that it constituted one of the mutual considerations of the contract, but upon the idea that it was an exemption voluntarily given and liable to be taken away, when in the judgment of the Legislature it should be no longer needed for the protection of the public.

For the reasons given we think there was no error in holding, upon the special verdict, that the defendant was not guilty, and the judgment of the Court below must be

Affirmed.

CLARK, J., dissenting: The defendant claims to be exempt from working the public roads by virtue of section 25, chapter 147, Acts 1852. This is the charter of the Western Railroad Company, since altered by chapter 67, Acts 1879, to the "Cape Fear & Yadkin Valley Railway Company," but retaining the same "rights, powers, privileges, immunities and franchises." Said section 25 provides, "That all the officers of the company and servants and persons in the actual employment of the company be and are hereby exempt from performing ordinary militia duty, working on public roads and serving as jurors."

If it be conceded that the Legislature had the power to grant this exemption still the right to the service of its citizens for the performance of military, road and jury duty is an essential element of sovereignty. It cannot be the subject of contract or inalienably bargained away. *Railroad* v. *Alsbrook*, 110 N. C., 137. Like similar exemptions of other classes of the community it is subject to revocation by any

future Legislature, which can, according to its judgment, modify the exemptions, or repeal them, or change the ages at which any citizen shall become subject, or cease to be liable, to render such duties. Exemptions of particular classes of men, or in particular localities, are very common, and it would essentially cripple the powers of the sovereign if such exemptions were construed to be contracts and irrevocable. The fact that the exemption in this case is found in a clause of a railroad charter makes it a contract no more than if found in the charter of a city or town or in the incorporation of a firemen's or military company, in which they are not unusual. The exemption is like the exemption of "public millers," which is a revocable privilege extended to that necessary class of the community, but which is not a contract with mill owners that the legislative policy shall not be changed. In truth, such exemptions are mere privileges, revocable at the legislative will. That has been exercised as to this exemption by the general act (Acts 1879, ch. 82, sec. 4) which repeals all previous exemptions from road duty by providing that "all able-bodied male persons between the ages of eighteen years and forty-five years shall be required, under the provisions of this act, to work on the public roads, except," etc. Section 12 of this act provides, "All laws and clauses of laws in conflict with this act are hereby repealed." The act itself makes some exemptions, and others have since been made by the Legislature.

The grant of exemption from public duty to any class of citizens is a public matter, whether the grant is in a special or general act, or in a clause in a private or public statute. The Legislature has power to revoke the exemption, and this has been done by repealing "all laws and clauses of laws" (without excepting any) which conflict with the new statute, that all persons between the ages specified (with the excep-

tion named in the act) shall be liable to road duty. Endlich on Stat., 231. It was not required that the Legislature should seek out and recite every statute, public or private, which contained an exemption. It is sufficient, as this act does, to make *all* able-bodied persons of the ages named liable to road duty and to repeal "all laws and clauses of laws" in conflict with this requirement. Nor can it make any possible difference that this general repealing act passed in 1879 was brought forward in *The Code* adopted four years later.

Upon the special verdict the defendant should have been adjudged guilty. The case should be remanded to the end that the judgment be so entered, and that the Court may proceed to sentence according to law.