STATE on the Relation of Zeb V. Walser, Attorney General, and W. R. WOOD and others v. J. C. BELLAMY and others.

*Public Office—Property in Office—Abolition of Office—Statute—Repeal and Amendment of Statute.*

1. An office is property and is the subject of protection like any other property under the provisions of Section 17 of Article 1 of the Constitution, subject to the qualifications that it cannot be sold· or assigned or the performance of its duties (as a rule) deputed to another, and that for misfeasance and malfeasance the holder may, by competent authority, be deprived of the same.

2. A public office being private property, so long as the office is in existence the term for which the holder has been elected or appointed cannot be lessened to the prejudice of the incumbent, unless he has committed some act which works a forfeiture.

3. An office created by the Legislature may be abolished at its discretion, in which event the officer loses his office and his property in it, he having taken it with the implied understanding that the continuance of the office is a matter of legislative discretion.

4. The re-enactment by the Legislature of a law in the terms of a former law at the same time it repeals the former law, is not, in contemplation of law, a repeal, but is a reaffirmance of the former law whose provisions are thus continued without any intermission.

5. Chapter 265, Acts of 1897, entitled "An Act to charter the Eastern Hospital for the Colored Insane, and the Western Hospital for the Insane, and North Carolina Insane Asylum at Raleigh, and to provide for their government," which purports to repeal the charters of the institutions mentioned in sections 2240, 2241, 2242, 2243, 2244 of The Code, and to abolish the offices of the superintendent and directors of such institutions and to recharter them under other names and to create offices to be filled by officers under other designations, but does not substantially change the government or the duties of the officers, is, in effect, only an amendment to, and not a repeal of, the charters of the institutions named in said sections, and is invalid in so far as it attempts to abolish the offices of superintendent and directors of such institutions, or to deprive the holders thereof before the expiration of the terms for which they were respectively elected and appointed.

ACTION by the State of North Carolina on the relation of Zeb V. Walser, Attorney General, W. R. Wood and others, against J. C. Bellamy and others, to have the relators, other than the Attorney General and W. R. Wood, declared to be the trustees of the Central Hospital for the Insane, near Raleigh, and W. R. Wood declared to be the principal and resident physician of said hospital and to compel the defendants, who claim to be directors and superintendent of such hospital, to deliver it and the property thereof to relators, heard on a case agreed before *Adams*, *J.*, at CHAMBERS, in Raleigh, in April, 1896. The statement of facts agreed to is as follows:

"(1) That the General Assembly, on the 8th day of March, 1897, passed an act, a copy of which is hereto annexed, and on the 9th day of March, 1897, another act, a

copy of which is annexed, known as the 'Appropriation Act.' (2) That on the 9th day of March, 1897, the Governor nominated the relators as trustees of the Central Hospital for the Insane, and that on said 9th day of March, 1897, the Senate duly confirmed the nomination of said relators as such trustees. (3) That thereafter, on the said 9th day of March, 1897, three of the relators met at the capitol at Raleigh and having called one of their number to the chair, for want of a quorum, adjourned to meet in Raleigh on the 18th day of March, 1897. That, prior to the confirmation of the relators, the Governor notified them by wire that their nominations had been sent to the Senate, and requested them to meet in Raleigh, March 9th, but no notice was given to any of the relators after their confirmation, except M. L. Wood, Dr. Phil. J. Macon and Dr. B. S. Utley. (4) That on the said 18th day of March, 1897, pursuant to the adjournment, the said relators, each and every one of them, being nine in all, met in Raleigh, and qualified by taking the oath of office before W. H. Martin, a justice of the peace in and for Wake county, and organized by electing Dr. P. John, president, and M. L. Wood, secretary, and then elected Dr. W. R. Wood, of Halifax county, principal and resident physician for four years from and after his election. (5) That the defendants, other than Dr. George L. Kirby, are the directors of what was designated under Chapter 2, Volume, 2, of *The Code*, as the North Carolina Insane Asylum, elected and qualiffed under Chapter 2, Volume 2, of *The Code*, and acts amendatory thereof, whose terms of office have not expired, unless they are put to an end by the legislation and facts set forth in this case; and that the defendant, George L. Kirby, was elected by said board on the 7th day of March, 1894, to fill the unexpired term of six years of Dr. W. R. Wood, resigned, said Wood's

term beginning on the 8th day of March, 1893, as will appear from an extract from the minutes of the board of directors at their meeting held on the 8th day of March, 1894, the salary of said Kirby being fixed at $2,800 per annum. That R. N. Cotton, R. H. Speight and John R. Smith constitute an executive committee (if they are still in office, under the legislation and facts hereinbefore set forth), who receive $4 each per day, when in session, as compensation. (6) That the defendants are in possession and in control of all the property belonging to the said Institution for the Insane near Raleigh, by whatever name it should be called, claiming to be the properly constituted authorities and custodians thereof under the law. (7) That, on the 18th day of March, 1897, the relators made due demands on the defendants for the possession, management and control of the said asylum and all of its property, which demand was refused by the defendants. (8) That the defendant, John R. Smith, was duly appointed and qualified on the — day of March, 1895, as a director of said North Carolina Insane Asylum for the term of six years. That he was appointed and qualified as Superintendent of the State Penitentiary on the — day of March, 1897. (9) That the original charters of the said asylum, Chapters 1 and 2, Acts of 1848, and Chapters 73 and 74, Acts of 1858, and all Acts amendatory thereof, and other private or other laws relating to said asylum, shall be considered as a part of this case.

His Honor rendered judgment as follows:

"This cause coming on to be heard upon an agreed statement of facts and the complaint and answer, and the court being of opinion against the right of the relators or any of them to recover and so holding, it is thereupon considered and adjudged that this action be dismissed, and that the defendants go without day and recover their costs to be taxed

ty the clerk. It is further considered and adjudged that the defendant, John R. Smith, by accepting the office of Superintendent of the State Penitentiary, has vacated the office of trustee or director of the State Insane Asylum near Raleigh." From this judgment the plaintiffs appealed.

*Messrs. A. C. Avery* and *J. C. L. Harris,* for plaintiffs (appellants).
*Messrs. Shepherd & Busbee,* for defendants.

MONTGOMERY, J.: The defendant, Kirby, at the time of his election, and the other defendants, at the time of their appointment, were public officers and they are entitled to hold their offices, their terms not having yet expired, unless their right to the same has beeen divested by an Act of the last General Assembly, ratified on the 8th day of March, 1897, and entitled "An Act to Charter the Eastern Hospital for the Colored Insane and the Western Hospital for the Insane and North Carolina Insane, at Raleigh, and to provide for their government." In examining that Act with the view of arriving at its construction and effect, we are not disposed to inquire into the motives of the legislators in enacting the bill into a law, nor is it necessary to do so to arrive at a proper legal conclusion. If the General Assembly has in some of the provisions of the Statute gone beyond its powers, such a course may be attributed to another motive than a wilful attempt to violate the Constitution. In the great opinion delivered in the case of *Hoke* v. *Henderson*, 15 N. C., 1, Chief Justice Ruffin said for the court: "All men are fallible, and in the dispatch of business, the heat of controversy and the wish to effect a particular end, may inadvertently omit to scrutinize their powers and adopt means adequate indeed to the end, but beyond those powers."

Before proceeding to an examination of the Statute it will be in order to announce that, after full and able argument and after a careful examination of authorities cited by counsel from the courts of this and other States, we adhere to the opinion that an office is property and is the subject of protection like any other property under the provisions of Section 17 of Article 1 of the Constitution. *Hoke* v. *Henderson, supra; King* v. *Hunter*, 65 N. C.. 693; *Cotten* v. *Ellis,* 52 N. C., 545; *Bailey* v. *Caldwell*, 68 N. C., 472; *Bunting* v. *Gales*, 77 N. C., 283. And yet it is true that public offices being for the public good and convenience, are not so completely the subject of property as are many other species of possessions. Property in an office is qualified to some extent by the duties which the holder owes to the public in their performance. As, for instance, a public office cannot be sold or assigned. The holder cannot, as a rule, depute to another the performance of the duties of the office. And for misfeasance or malfeasance, the courts or other competent authority under such laws as may be in force on the subject, may deprive the holder of the same. But if, such limitations and restrictions be excepted, a public office is as much the subject of property as a man can have in anything. The emoluments of the office are private property "as much," as was said in *Hoke* v. *Henderson, supra*, "as the land which one tills, or the horse he rides, or the debt which is owing to him."

The emoluments of a public office being then private property, it would seem to follow logically that, the terms for which the defendants were elected and appointed, respectively, not having expired, they could not be ousted except for cause, for the committal of some malfeasance in office, or unless they had failed and refused to perform the duties of their office, or unless the offices themselves had been

120—28

abolished. As long as the office is continued, the term of office, it does seem in reason and justice, ought to be the private property of the holder; and to take it from him and give it to another by legislation is in effect and reality a judicial act, and the sentence is pronounced without trial and without a hearing. And the law is to that effect. It is clearly decided in *Hoke* v. *Henderson*, *supra*, and approved in *Bunting* v. *Gales*, 77 N. C., 283, that, as long as the office is in existence, the term likened to a grant for which the holder has been elected or appointed canont be, lessened to the prejudice of the grantee. In *Cotten* v. *Ellis*, *supra*, it appeared that the office of Adjutant General had not been abolished, but that the duties of the office had been transferred to another before the plaintiff's term had expired, and Chief Justice Pearson, delivering the opinion of the court, said: "The legal effect of the (first) appointment was to give the office to the applicant (in *mandamus*) and he became entitled to it as a 'vested right' for the term of three years, from which he could only be removed in the manner prescribed by law and of which the legislature had no power to deprive him. This is settled. *Hoke* v. *Henderson*, 15 N. C., 1."

In *Kiny* v. *Hunter*, *supra*, Judge Reade, who delivered the opinion of the court, said: "Nothing is better settled than that an office is property. The incumbent has the same right to it that he has to any other property. There is a contract between him and the State that he will discharge the duties of the office—and he is pledged by his bond and his oath; and that he shall have the emoluments—and the State is pledged by its honor. When the contract is struck it is as complete and binding as a contract between individuals, and it cannot be abrogated or impaired except by the consent of both parties." And in *Bailey* v. *Calkwell*, the opinion was in these words: "The

case of *Cotten* v. *Ellis*, 52 N. C., 545, is directly in point. Cotten had been appointed adjutant general for three years, with a salary of $200. The legislature passed an Act repealing the law under which Cotten had been appointed, both as to his appointment and salary. Cotten served out his term and demanded pay, which the Governor (Ellis) refused. And this court decided that he was entitled to it. The principles of that case are the same as in this, and it is unnecessary to repeat them.''

So that, whatever the law may be in other States, it is settled beyond question in North Carolina that a public office is property, is a vested right, exists by contract between the State and the holder, and that as long as the office is continued the holder cannot be deprived of his term against his consent, unless he has committed some act which works a forfeiture. We have no desire to disturb the decisions of our court on this subject. They are founded on the principles of justice and of safe public policy.

But the plaintiffs further contend that the offices which the defendants hold were abolished by the Act of 1897, and that they themselves are now the persons entitled to the same. It is undoubtedly the law in North Carolina that an office can 'be abolished, and that as a result the officer loses his office and his property in it. This is no breach of the contract on the part of the State. The holder accepted the office subject to this contingency. No one could contend that, because an office was in the estimation of the legislature useful and necessary at the time of its creation, such an office would continue to be forever a public necessity. If an office once useful should become useless and an unnecessary charge upon the people, it is not only a right of the legislature to abolish it, but it is its duty to do so. And, as we have said, every man elected or appointed to an office created by the legislature takes it with the implied

understanding that the continuance of the office is a matter of legislative discretion, the office depending upon the public necessity for it.   In *Hoke* v. *Henderson, supra,* it is said that "It may be quite competent to abolish an office; and true that the property of the office is thereby of necessity lost.   Yet it is uite a different proposition that, although the office be continued, the officer may be discharged at pleasure and his office given to another. The office may be abolished because the legislature esteems it unnecessary."

Of course, an office created by the Constitution cannot l·e abolished by the legislature.

We are now brought to the consideration of the contention of the plaintiffs that the offices which the defendants have been, and are now in possession of, have been abolished by the Act of 1897.   The first section of the Act provides "That section 2240 of *The Code* be *amended* by striking out the folowing words:   *   *   *   'Eastern North Carolina Hospital, located near Goldsboro,   *   *   *   and the State Insane Asylum, near Raleigh.'"   *   *   *   The Insane Asylums near Goldsboro and Raleigh are not known by the names of "Eastern North Carolina Hospital" and "State Insane Asylum," in Section 2240 of *The Code.*   The draftsman of the bill seemed to be ignorant of the corporate names of the different Insane Asylums in this State.   Ordinarily, the failure of an Act to give the complete and full name of a corporation where there could be no reasonable doubt as to which institution was meant, would be of no significance; but, where it is undertaken by legislative enactment to change the names of such institutions and to confer new names upon them, it does seem that pains would be taken to at least find out the true corporation names of those discarded.   And, when such is not done, the presumption of fact arises that the change was of no material

consequence or importance in the mind of the legislature. Such carelessness would not have happened if the legisla-tors themselves had thought the matter of any importance. Throughout this Act, and also the one passed at the same session providing for the support of these institutions, the old and new names of incorporation are frequently used, interchangeably. But suppose the true corporate names had been called in section 1 of the Act and the new names properly conferred, could any reasonable man imagine that the change in the names of these asylums could possibly have altered the foundations of them or affected the duties and rights of any person officially connected with them? Surely, no one would answer in the affirmative.

But the plaintiffs further contend, because the Act de-clares that the office of Superintendents of the old corpora-tions are abolished, and the office of principal and resident physician substituted therefor, the latter, elected for four years instead of six, as was the Superintendent, and that because the government of the new corporation shall be under the management of nine trustees, called the Board of Trustees, elected for a term of four years instead of in classes of three for six years, the terms expiring at different times, as under *The Code*, and are called the Board of Di-rectors, the offices under the old corporation are abolished and the new ones take their places. This contention can-not be sustained.

The legislature of 1870-'71, upon the return to power of one of the political parties, undertook to remove the officers of the North Carolina Institution for the Deaf and Dumb and the Blind, who were of another political faith, and in the Act for that purpose (Chapter 55) resorted to this same device of changing the names of the offices to carry out their purpose. The Act (1870-'71), called the new board,

which it created, the *Board of Trustees*, in substitution of
the old board, which was called the *Board of Directors*,
and used the very word used in the Act of 1897, "abol-
ished." It declared that the Board of Directors should be
*abolished* and the powers, rights and duties heretofore pre-
scribed by law to said board shall hereafter be granted to
and imposed upon the Board of Trustees." It seems that
the new Board, called the Board of Trustees, took posses-
sion of the property and affairs of the corporation, but upon
an action being commenced by the old Board of Directors
against the Board of Trustees, and brought to this court
on appeal, it was held that the legislative appointment
was invalid, and that the title to the offices was in the old
board of directors. It was also held that the Legislature
had the right to change the name of the board by which
the institution was governed, from the Board of Directors
to that of the Board of Trustees, but that in doing so it
left the board the offices to be filled by officers. *Nichols*
v. *McKee*, 68 N. C., 429. The Act did not in fact abolish
the offices changing the name of the board, although the
Act declared that the Board of Directors was abolished.
The offices were left as before, and the abolition of the
Board of Directors was one of words only.

The draftsman of the Act of 1897 would have done well
to look at the Act of 1870-'71, and the decision of this
court upon it. We have examined the Act of 1897 care-
fully, and there is not one single duty required of the new
Board of Trustees that was not required of the old Board
of Directors. There is no change as to duties, rights or
powers. There is nothing in the Act but the same old
offices with changed names, with the same duties, rights
and privileges as were provided under the old law. In fact
the latter part of Section 3, which amends Sections 2241,

2242, 2243 and 2244 of *The Code*, by striking out the old names of the asylums and substituting new ones, declares that "Those Sections of *The Code* thus amended, and Chapter 2, Vol. 2, of *The Code*, except as hereinafter provided, are re-enacted." There follows the above proviso no other provision except the one changing the name of the office of Superintendent to that of Principal and Resident Physician. And the latter part of Section 6 of the Act provides, "that Chapter 2, Volume 2, of *The Code* shall in all respects apply to the corporations hereby created, except as modified by Section 8 of this Act"—Section 8 being in these words: "It is not the intention of the General Assembly that the trustees herein provided for shall be offices within the meaning of section 7 of Article XIV of the Constitution, and they are declared to be special trustees for the special purposes of this Act." These places have been held to be offices, as we have declared in this opinion, and the Legislature by simply declaring that they shall not be offices does not change the nature of the thing.

In the case of *Clark* v. *Stanley*, 66 N. C., 60, Chief Justice Pearson delivering the opinion of the court, defining what a public office is, said: "A public office is an agency for the State, and the person whose duty it is to perform this agency is a public officer. The essence of it is the duty of performing an agency, that is, of doing some act or acts or series of acts for the State." It is idle under the decisions of this Court to say that such a position as these defendants hold is not an office, as it would be to say that a horse is not a horse because one may choose to call him some other animal.

We are of the opinion, upon a careful examination of the Act, that it is an amendment, as it declares itself to be, of Chapter 2, Vol. 2, of *The Code*, and not a reapeal of that

chapter.    It is true, that in the first Section it declares that
the charters of said hospitals, by whatever name, and all
Acts amendatory of said charters, are hereby repealed,"
yet, with the exception of a change in the names of the
offices and of the institutions (with some insignificant de-
tails about the salaries of the superintendents and the ap-
pointment of the directors), the whole of Chapter 2, Vol.
2, of *The Code* is re-enacted, or, as the Act itself declares,
"And the provisions of Chapter 2, Volume 2, of *The Code*,
applicable to the directors of the North Carolina Insane
Asylum, not in conflict with the provisions of this Act, are
hereby made applicable to the Board of Trustees of this
State Hospital for the Insane and the Western Hospital for
the Insane, and as modified by this Act, are hereby re-
enacted."

In *State* v. *Williams*, 117 N. C., 753, it is said: "The
re-enactment by the legislature of a law in the terms of a
former law at the same time it repeals the former law, is
not in contemplation of law a repeal, but is a reaffirmance
of the former law whose provisions are thus continued with-
out any intermission."    The effect of the Act, then, is that
it has only a prospective operation as to the change of the
name of the Institution and the names of the offices con-
nected with it, and that the defendants (the incumbents)
are entitled to hold on to their offices—the defendant,
Kirby, for the term for which he was elected, and the other
defendants for the terms for which they were appointed
and until their successors are duly elected and appointed
and qualify.

There is no error in the judgment of the court below and
the same is affirmed, except that part of the judgment as
to the right of John R. Smith, which is not set out in the
complaint, and is therefore set aside, that matter not being
before the court.