STATE PRISON OF N. C. et als. v. W. H. DAY.

(Decided April 11, 1899).

*Public Office, Abolishing—Act of January 26, 1899—Superintendent of Penitentiary—Appointment by Governor.*

1. A public office is an agency from the State, and the person whose duty it is to perform this agency is a public officer.

2. The place of Superintendent of the State Prison, with its attendant duties, is a public office, not created by the Constitution but by a statute.

3. While the General Assembly has the power to abolish an office created by legislative authority, it can not by a mere transfer to others of the duties. connected with an institution, necessary and useful to the public, to be exercised by them, oust the incumbent from an office belonging to him under a contract with the State.

4. The Act of January 26, 1899, is in conflict with the Constitution of North Carolina, Article I, section 17.

5. The Governor never makes a nomination to the Senate to fill vacancies—he simply appoints.

CIVIL ACTION for the possession, custody and control of the State's Prison, the convicts and all the property and accessories belonging thereto, tried before *Brown, J.,* at February Term, 1899, of WAKE Superior Court.

This action was brought under a special Act of February 15, 1899, to assert the right claimed by plaintiffs by virtue of the Act of January 26, 1899, abolishing the office of Superintendent of the Penitentiary and transferring to them the custody, the property and management of the institution from the defendant, who had been appointed Superintendent by the Governor.

The defendant resists the demands of plaintiffs, averring

that the Act of January 26, 1899, set out in the complaint, is unconstitutional and void, in that its object is to deprive him of his office of Superintendent of the State's Prison and to continue the functions of said office to be performed by others. His Honor sustained the validity of the Act and rendered judgment against defendant, who appealed.

*Messrs. Joseph B. Batchelor, James C. MacRae, C. F. MacRae, Argo & Snow,* and *Thos. N. Hill,* for defendant (appellant).

*Messrs. R. O. Burton* and *Shepherd & Busbee,* for plaintiffs.

MONTGOMERY, J., delivers the opinion of the Court.

FURCHES, J., delivers concurring opinion.

CLARK, J., delivers dissenting opinion.

MONTGOMERY, J. This action was brought under section 1 of an Act of the General Assembly, ratified on the 15th of February, 1899. The language of that section is as follows: "That in addition to the remedy prescribed by The Code, sections 603 to 621 inclusive, the Board of Directors of the State's Prison of North Carolina, or the Executive Board thereof, or both, with or without the jointure of the State, shall have the right, in an action for injunction or *mandamus,* to test in the Courts the claims of any claimant or claimants to the possession, custody and control of the property of the State's Prison, and of the convicts therein confined."

The object of the statute, then, was simply to have a decision by the Courts of this question: Who of the conflicting claimants is, or are, entitled by law, to the possession and custody of the property of the State's Prison and of the convicts therein confined? The claimants (so far as this record

shows) are the plaintiffs, on the one side, and the defendant on the other. The rights of any other person or persons that may be connected with the conduct and management of the State's Prison are not now before us for consideration. This Court will not anticipate litigation between rival claimants for office, and if such litigation should occur, each case must be heard and decided on its merits on cases properly constituted in the Courts.

The Governor of the State, under the provisions of Chapter 219 of the Acts of 1897, appointed John R. Smith Superintendent of the State's Prison for the term of four years, and his nomination was consented to by the Senate. The compensation attached to the office was a salary of $2,500. After the adjournment of the General Assembly of 1897 Smith resigned the superintendency, and J. M. Mewborne was appointed by the Governor in Smith's place. On the 1st day of January, 1899, a few days before the General Assembly of that year convened, Mewborne resigned, and the defendant, W. H. Day, was appointed Superintendent to fill the vacancy. Day's nomination by the Governor was never sent to the Senate, nor did that body confirm the appointment. Day, under his appointment, took possession of all the property of the State's Prison, and the control of the convicts. This action was brought by the plaintiffs to recover of the defendant the property in his possession belonging to the State and appertaining to the State's Prison, and to get the control of the convicts and to have the rights of the parties declared. In that way the plaintiffs seek to get a decision by the Court on the matter which it was desired to have settled by the Act of February, 1899.

The plaintiffs' alleged right of recovery is founded on the provisions of an Act of the General Assembly ratified on the 26th day of January, 1899, to go into effect on the 10th day

of February, 1899, as to its requirement for the delivery of the State's Prison and the convicts therein by the persons then in charge of the State's Prison to the Board of Directors provided for in the Act. As to the other provisions, they went into effect from the date of ratification of the Act.

Under the provisions of the last-mentioned Act, the plaintiffs, claiming to be a Board of Directors, duly elected and appointed by the General Assembly, allege that the office of Superintendent has been abolished; that the property of the State Prison, the control of the convicts and the conduct of the Prison were vested in them by the Act of January, 1899, and that therefore they are entitled to the possession of the property and the control of the convicts, to the end that they may properly execute their trust.

And again, the plaintiffs allege that if it be so that the office of Superintendent was not abolished by the Act of 1899 yet the defendant Day's tenure ceased upon the ratification of the Act because he was not nominated by the Governor nor his appointment confirmed by the Senate.

The defendant avers that the Act of January, 1899, though on its face it purports to abolish the office of Superintendent of the State's Prison, does not in law have that effect; that it simply transfers the duties and functions of the office of Superintendent to the three plaintiffs, who allege that they compose an Executive Board, to be performed by them, and that such an attempt to deprive the defendant of his office on the part of the General Assembly is contrary to the provisions of our State Constitution, Article I, section 17 (Bill of Rights) and to those of the constitution of the United States, Article XIV, section 1. The defendant further avers that the whole Act of 1899 is void.

The great public importance of the matter involved and the appearance on both sides of counsel eminent in the pro-

fession and learned in the philosophy as well as in the details of the law, naturally prepared the Court for elaborate and discursive argument (oral and by brief) and we were not disappointed in our anticipations.

A great deal of the learning which was displayed, however, was not new. Many of the questions discussed had been so often and so consistently decided by the adjudications of this Court that they could not be held to be open questions, as, for instance, that such a place as that of Superintendent of the State's Prison, with its attendant duties, is a public office *(Clark v. Stanley,* 66 N. C., 59; *Hoke v. Henderson,* 15 N. C., 1; *Wood v. Bellamy,* 120 N. C., 212) : That an office is property and the incumbent has the same right in it as he has to any other property except that he can not sell or assign it *(Hoke v. Henderson, supra; King v. Hunter,* 65 N. C., page 603; *Cotton v. Ellis,* 52 N. C., 545; *Wood v. Bellamy, supra)* : That the General Assembly has the power to abolish an office created by legislative authority *(Cotton v. Ellis,* 52 N. C., 545; *State v. Smith,* 65 N. C., 369; *Wood v. Bellamy, supra; Ward v. Elizabeth City,* 121 N. C., 1) : That the Legislature can, except in those instances prohibited by the Constitution, take away some parts of the duties of an officer and make a not inequitable reduction of the officer's salary *(Cotton v. Ellis,* 52 N. C., 545; *Bunting v. Gales,* 77 N. C., 283; *King v. Hunter,* 65 N. C., 603. But in those cases it is also held that the officer's entire salary can not be taken from him and thereby starve him, nor could the Legislature select a particular officer and by a special law applicable to him alone, deprive him of any material part of his duties and emoluments) : That the words, in section 10, Article III, of the Constitution of 1868, viz.: "That the Governor shall nominate.... and appoint all officers whose offices are established by this Constitution, *or which shall be created by*

*law, and* whose appointments are not otherwise provided for, *and no such officer shall be appointed or elected by the General Assembly,"* meant appointments not otherwise provided for in *that Constitution;* and therefore, the Governor had under that Constitution the general power of appointing to office (the exceptions being in cases where the appointments were otherwise provided for in that Constitution) to the exclusion of the Legislature *(McKee v. Nichols,* 68 N. C., 429) ; *but,* that the words which we have quoted from Article III, section 10 of the Constitution, and which appear in italics in the quotation, being omitted in the present Constitution, it is clear that the Convention of 1875 intended to alter the Constitution as interpreted in *McKee v. Nichols, supra,* on that point, and to confer upon the General Assembly the power to fill offices created by statute. *Ewart v. Jones,* 116 N. C., 570.

Having disposed of all the above-mentioned collateral questions which were the subject of argument in the case, interesting more as matters of constitutional and judicial history than as strictly applicable to the controversy before the Court, by the citations of repeated decisions of this Court, we can now come down to the discussion of the point, the real controversy in the case; that is, was the office of Superintendent of the State's Prison abolished by the Act of Assembly ratified January, 1899 ? We may say *in limine* that we have had no trouble in arriving at the conclusion that the office of Superintendent is not an office created by the Constitution. Section 3 of Article XI of the Constitution ordained: "That the General Assembly shall, at its first meeting, make provision for the erection and conduct of a State's Prison or Penitentiary," * * * and that provision, in our opinion, imposes upon the Legislature the duty of attending to the details as to the erection of the necessary buildings, the pur-

chase of such property, real and personal, as may be necessary for the uses of the Prison; and also to form such regulations for the government and conduct of the Prison as may seem proper. The officers or placemen, their salaries and the distribution of their duties are all left with the General Assembly.

On the real question in controversy, the contention of the plaintiff is that the office of Superintendent of the Prison was abolished by the Act of 1899, because (1) The act declared in so many words that the office was abolished; because (2) The responsibility and actual management of the Prison are placed upon the Board of Directors and taken from the one-man power—that of the Superintendent, and that the incumbent had an implied notice that the General Assembly might, when it saw fit, take that course; because (3) The Act incorporated the State's Prison; because (4) It increased the number of Directors; because (5) It transferred the duties attendant upon the office to the Board of Directors for performance.

To aid us in arriving at a correct conclusion in this case a recurrence to the true idea of the nature and character of a public office has been useful to us. In the text-books it is taught that the word *office* in its primary signification implies a duty or duties, and, secondarily, the charge of such duties—the agency from the State to perform the duties. The duties of the office are of the first consequence, and the agency from the State to perform those duties is the next step in the creation of an office. It is the union of the two factors, duty and agency, which makes the office. In *Clark v. Stanly,* 66 N. C., 59, the Court said that "A public office is an agency from the State, and the person whose duty it is to perform this agency is a public officer. . . . The oath, the salary or fees are mere incidents, and they constitute no part of the office." With that idea, then, of what an office is, has the office of Superintend-

ent been taken from the defendant and given to others by the Act of Assembly? If the duties of the office were necessary and useful to the public, and they have been transferred to others who are exercising them as still necessary and useful to the public, and the State's Prison, in behalf of which those duties are performed, is substantially the same institution as it was before the Act of Assembly of January, 1899, was ratified, then, under all the decisions we have cited in this case bearing upon the point, the office of Superintendent (defendant's property) has been taken from the defendant contrary to the law of the land—contrary to the provisions of the Constitution of North Carolina, Article I, section 17. If the institution, the State's Prison, is the same substantially that it was before the passage of the Act, if the purposes for which it was established are the same now as then, and if the subject-matters over which the management and conduct extend be the same, then there is existing a contract between th State and the defendant as to his office, and it can not be violated during his term. The State, through the General Assembly, might be satisfied that the management under the Executive Board created by the Directors under the Act is the better plan and the safer one for the public, yet that is only a matter of method of management, a choice between two modes (that is, whether it is better for three to control than for one), and such a choice can not be made until the defendant's term has expired. A new method of distributing the powers and duties of the government and conduct of the State's Prison may be desirable, and the method undertaken to be adopted in the Act of 1899 may be the best, and yet such changes can not be made until the expiration of the contract with the incumbent. It has been suggested that if the State has not the power when it sees fit to abolish an office and transfer its duties to others, that an incumbent might get into an

124—24

office for a very long term of years (a term not amounting to a perpetuity, however, which would be illegal), and indifferently execute the duties of the office, but not so poorly as might amount to incapacity, and thereby inflict great injury on the interest of the public. The answer to that is that if such should be the case it would be the fault of the legislative branch of the government in fixing an unusual term of office, and not a matter reviewable by this Court.

Then, the conclusion of the case turns upon whether the State's Prison is substantially the same institution that it was before the Act of 1899, whether the purposes for which it was established are the same now as then, and whether the duties performed by the defendant were the same duties substantially which were transferred to Board of Directors and now being performed by the Executive Board under the Act of 1899.

It is ordained in the Constitution that the State's Prison is to be used for the purposes of reformation and of punishment, and that is the object of the institution now. The incorporation of the institution, if it be conceded that it was incorporated by the Act of 1899, can in no sense affect the defendant's office if it has not otherwise abolished it. The bare incorporation of the institution would not affect or alter in any way the duties of the Superintendent or any other of the officers or placemen or employees. With the exception of the power given in the Act of 1899 to the directors to sell or lease the lands or other property of the State's Prison, the duties and the powers in all respects of the Board of Directors, acting through the Executive Board as their head, are in all respects the same as the duties required of and the powers conferred upon the Superintendent under the Act of 1897, as the following analysis and comparison will show. Under the various sub-sections of section 5 of the Laws of 1897, the

duties of the Superintendent are specified in detail, as follows: (1) Under this sub-section he is to receive and to have the custody of the convicts. That responsibility and duty are put upon the new Board of Directors and their agents under section 7 of the Act of 1899; (2) Under this sub-section it was made the duty of the Superintendent to keep employed the convicts in the prison and on the farms, and to hire them to others. Under section 7 of the Act of 1899 that duty was devolved on the Board and their agents. (3, 4 & 5). Under these sub-sections the Superintendent was authorized and required to purchase necessary articles of food and clothing for the convicts and to employ and take care of them; to sell the products and manufactured articles; to receive and account for the proceeds of sale of articles produced and manufactured, and to make a deposit of the same and to check it out. Those duties are transferred to the Board of Directors and their agents by section 6 of the Act of 1899. (6) This sub-section makes it the duty of the Superintendent to take custody of the property of the State's Prison and to protect the same. This duty is transferred to the Board and their agents by sections 6 and 8 of the Act of 1899. (7) The Superintendent is authorized under this sub-section to appoint the subordinates, such as wardens, physicians, supervisors, overseers, guards and employees. These subordinates, designated under the Act of 1899 as wardens, physicians, managers, supervisors or overseers, are to be appointed by the Board of Directors though the Executive Board by sections 5 and 9 of the Act of 1899. (8) Under this subdivision there is imposed upon the Superintendent the duty of rendering at the end of each year to the Board of Directors a statement of all financial transactions of the State's Prison for the preceding year, together with an inventory of all property on hand and its value. Those duties are required to be per-

formed by the agents of the Directors, the Executive Board, under sections 5 and 6 of the Act of 1899. Under Chapter 219 of the Laws of 1897, the Board of Directors were a general supervisory power; by the Act of 1899 the Board of Directors through the Executive Board are clothed not only with a general supervisory authority, but with all the functions and with all the duties of the Superintendent and with the power to distribute those functions and duties amongst themselves or others.

If we have not fallen into error in the above analysis and comparison, and we feel confident that we have not, then, no new duties for the government of the State's Prison have been imposed, nor have any new powers been granted to any persons except the power granted to the Board of Directors to sell or lease the lands of the State's Prison, and which additional power we think does not alter the nature or the character of the institution. No function or duty that was formerly performed or imposed upon the Superintendent is abolished. The functions and duties of that office are still necessary to the public welfare. They have not been abolished; they have been simply transferred to others. That can not be done according to the law of the land. *Wood v. Bellamy* and *Hoke v. Henderson, supra; Cotton v. Ellis,* 52 N. C., 545. That *three* of the Directors have been made the governing head of the institution under the name of Executive Board, and that to them the duties and functions of the office of Superintendent have been transferred, does not change the application of the law. It is the same as if the duties of the office had been transferred to one person. It is not a valid argument to contend that the Executive Board can conduct the State's Prison in a better and more satisfactory manner than can one man. It may be true in point of fact, and that plan can be tried at the end of defendant's

term of office. The contract of the State with the Superintendent must be kept. In Throop on Public officers, section 21, it is said: "Nor can the Legislature take from the officer the substance of the office and transfer it to another, to be appointed in a different manner and to hold by a different tenure, although the name of the office is changed, or the office divided and the duties assigned to two or more officers under different names." That principle of law was announced in *Warren v. People,* 2 Denio, 272, and also in *People v. Albertson* 55 N. Y., 50. The section in Throop, and the decisions in *Warren v. People* and *People v. Albertson, supra,* are in connection with offices created by constitutional provision. But that makes no difference in North Carolina. Under our decisions, you can not oust an incumbent of an office and continue the office afterwards, and this rule applies to offices created by the Constitution as well as to those created by the Legislature.

It was not necessary for the appointment and nomination of the defendant to have been confirmed by the Senate. There was a vacancy due to the resignation of Mewborne. The Governor never makes a nomination to fill vacancies in office. He does that alone in all cases, as was decided in *People v. McIver,* 68 N. C., 467.

The defendant is entitled to the possession of the property of the State's Prison, to the control of the convicts as under the law of 1897, and to the right to execute the duties of the office of Superintendent of the State's Prison.

Reversed.

FURCHES, J., concurring. While I fully concur in the opinion of the Court, I hope I will be pardoned for briefly expressing my views upon this important question.

.It is too plain for argument that the position the defendant

held was a public office. I do not think this is denied by plaintiff. This being so, he had a property in this office, that could not be transferred to another or to others. This is the law of this State, and it has been so held by this Court in every case involving this question from *Hoke v. Henderson*, 15 N. C., 1, to the present time, without a single exception. It is true that it is argued for plaintiff that *McDonald v. Morrow*, 119 N. C., 666, and *Ward v. Elizabeth City*, are not in accord with *Hoke v. Henderson*, but upon examination it will be found that this is not so. *Hoke v. Henderson* is cited with approval in both these cases.

The Act under discussion in *McDonald v. Morrow* was the Election Law of 1895, and in that Act it was provided that such appointments as those under consideration were void, and the Court in considering the case stated that as they claimed to hold under that Act, it must be held that they took subject to the terms of the Act they claimed to hold under. There was no question presented in that case as to the repeal of the statute or the abolition of the offices claimed by the defendants.

In *Ward v. Elizabeth City*, 121 N. C., 1, the plaintiff failed in his action upon two grounds: that the corporation under which he claimed to hold office had been abolished, and a new corporation created out of new territory and new population to a very great extent, and for the further reason that he had abandoned his claim to the office. Justice Clark wrote the opinion of the Court in *Ward v. Elizabeth City*, in which he cited with approval both *Hoke v. Henderson* and *McDonald v. Morrow*, and distinguished that case from *Wood v. Bellamy*. So I repeat that there is not a case to be found in our reports that does not recognize the doctrine laid down in *Hoke v. Henderson*, to be the law in this State. It has been held ever since it was delivered in 1833 to be the

leading case on this subject, and is styled by Chief Justice Pearson as "that great mine of learning."

That case, and every case since that case, discussing the right of an incumbent to hold his office, recognizes the right of the Legislature to abolish a legislative office, and that when the office is abolished the right of the incumbent to hold it is gone, because there is no office to hold. But all the reported cases from *Hoke v. Henderson* down to and including *Wood v. Bellamy,* 120 N. C., 212, hold that to have the effect of ousting the incumbent before his term expires the office must be *abolished*. That it is not sufficient to declare that it is abolished when it is not abolished. That the office is intangible, and consists in the duties of the office, and while these duties are continued the office is continued. The discussion then comes down to this: are the duties of the office the defendant held *abolished* or are they transferred to others?

In discussing this question I do not expect to enter into a discussion of policies that might influence me if I were acting as a legislator. Nor do I expect to count the number of lawyers in the Legislature that passed this Act; nor do I expect to impugn their motives, as it seems to be thought I will if I am of the opinion that the Act is unconstitutional. This kind of argument should have no weight with an independent judiciary. If this suggestion is true it convicts every Judge that has ever occupied a seat on this Court of being guilty of impugning the motives of the Legislature—Taylor, Henderson, Ruffin, Pearson and all their associates. If this were so, I suppose there would never be another Act of the Legislature declared unconstitutional. I hope that I may never be influenced in the discharge of what I consider my duty by such considerations. I propose to regard this Legislature just as I would any other Legislature, and to deal with its legislation just as I would any other Legislature—just as I

did the Legislature of 1895, and I agreed with the Court in an opinion declaring a similar Act passed by that Legislature unconstitutional.   And in doing so I did not impugn their motives nor do I suppose any other member of the Court did. I suppose that Legislature thought the Act of 1895, reviewed by this Court in *Wood v. Bellamy,* constitutional; and I suppose the Legislature of 1899 thought this Act constitutional. But when it comes before us for review I can not be governed in my opinion of the law by what they may have thought.

It is contended that if we sustain the defence and restore the defendant to his office there is danger ahead of us: That we might get a Legislature that would extend the terms of office to ten and even to twenty-five years. I do not think we are likely to have a Legislature that would be so revolutionary as that.   But what if we should, is this the forum to be appealed to for relief ?   The leading case of *Hoke v. Henderson,* in which Chief Justice Ruffin delivered his great opinion, was a case in which Henderson, the defendant, claimed to have an office for life; and the Court sustained his claim.

It seems to me that defendant's claim is looked upon with disfavor as resting upon an Act passed by the Legislature of 1897.   I don't know that it should be discredited on that account.   But when it appears that the Act of 1897 was but the re-enactment of the Act of 1893, under which the party in possession of the Penitentiary in 1895 (the same party that passed the Act of 1893) held over in violation of the Act of 1895, it does not seem to me that it should be discredited because it was passed by the Legislature of 1897.

If the object of the Act of 1899 was simply to get rid of the office of Superintendent, as contended, why was it that the Legislature did not simply abolish that office and leave the institution to the management of the Board of Directors ?

They were there, and were substantially the same they were before the passage of the Act of 1893, which created the *office* of Superintendent.

If the object was simply to abolish the office of Superintendent, why did they not do this and let the matter stand there ? Why did they appoint *twelve* new Directors and establish an Executive Board of three to do the same thing the Superintendent had to do ?

Great stress is laid on the fact that *three* are to do what *one* did, and the "one-man power" is appealed to. Is this "one-man power" the question before us ? It seems almost to be conceded that if the duties of the Superintendent had been transferred to *one* man that the Act would have been unconstitutional. What difference does it make to the defendant whether his office is given to *one* or to *three?*

While we do not propose to discuss policies, this kind of legislation has a history in this State, to be learned from the records of this Court and its reported cases. In 1871–72 the legislative power and the executive power of the State were in the hands of different political parties. The legislative power undertook to take charge of the penal, charitable and beneficent institutions of the State before the terms of those in office had expired. But they failed, as may be learned from *Battle v. McIver,* 68 N. C., 467; *Badger v. Johnson, Ibid,* 471; *Nichols v. McKee, Ibid,* 429; *Welker v. Bledsoe, Ibid,* 457.

In 1895 the legislative power of the State was in the hands of one political party and the executive power in the hands of another political party; and the legislative power undertook to take charge of the institutions before the terms of the officers in charge had expired. And they failed. *Wood v. Bellamy,* 120 N. C., 212. In 1899 the legislative power of the State is in the hands of one of the political parties and the executive power is in the hands of another

political party; and the Legislature has again undertaken to take charge of this institution before the terms of the officers have expired, and they must fail. The Act considered in *Wood v. Bellamy,* in express terms, abolished the office of Superintendent; the Board of Directors, created a new corporation, provided for the reception of patients from Durham and Robeson Counties, established an insane division in the Penitentiary, and repealed all laws in conflict with that Act. In fact, every substantial question involved in this case was involved and considered by the Court in that case. The Court, constituted then as it is now, declared that the Act was unconstitutional by a full bench and without a dissenting voice. I must hold now as I did then, and I do this without impugning the motives of anyone, as I suppose they thought the Act constitutional.

CLARK, J., dissenting. The management and control of the State's Prison is essentially a governmental function. It is an indispensable part of the administration of the criminal laws of the State. No Legislature can denude the State of that power by giving it away or bargaining it away. It is a startling contention of the defendant that, because the Legislature of 1897 placed the control of the State's Prison in a Superintendent with vast powers and privileges, accompanied by a salary of $2,500, therefore, a subsequent Legislature is powerless to resume control and change the management because that would deprive him of his pay. This is to make the incident of greater importance than the subject, and the inalienable right of the State to control its own institutions subordinate to an office-holder's demand for a salary. If the Legislature could by creating a four years' term of office put it out of the power of the next Legislature to assert State control of its most important institution and a branch of its administration of the criminal laws, it could, by making the

term ten years, twenty-five years or fifty years, have forbidden the people of North Carolina from touching the institution during those periods. If the Legislature of 1897 could confer the great powers they did upon the Superintendent, without power of repeal, they could have conferred greater powers, the sole and absolute control in every respect. To change this would necessarily continue the same duties in the hands of other parties, and the defendant's contention is that would be to substantially continue his office in other hands, and illegal. That is the proposition before us. The defendant claims control of more than 1,000 of the State's convicts, possession of $200,000 of the State's property and to receive $100,000 annually from sale of the products of the State's farms with the appointment of 169 place-holders in the State's service, and to fix their salaries and other large powers, with no security to the State but a bond of $5,000, and it is gravely argued to us that the Legislature could not, in discharge of its governmental functions, change that system of government, because under the new Act necessarily the same duties would be discharged by the Directors and Executive Board and others, and the defendant would lose profitable employment. But governments are established for the benefit of the people, and not that office-holders may receive compensation—the last is purely incidental and only to be rendered when the State desires and receives the services. The office of Superintendent of the State's Prison or Penitentiary was created by legislative enactment (Laws 1897, Chapter 219, section 4), and therefore it can be abolished in the same mode and at the will of the Legislature. "The Legislature (of 1899) had the same power to abolish it that the Legislature (of 1897) had to create it." *State v. Walker,* 65 N. C., 461. The only question before us should be, has the office been abolished. The Act of 26th January, 1899, "To provide for the government of

the State's Prison," provides (section 12) : "The office of Superintendent of the Penitentiary is hereby abolished, and all laws and clauses of laws, providing for the appointment of or imposing any duties upon, or providing for, any compensation for such officer are hereby expressly repealed." As the Legislature had power to abolish the office, the above would seem a clear-cut unmistakable expression of their will that the office has been abolished. Two late decisions of this Court are decisive of the point. In *Wood v. Bellamy*, 120 N. C., 212, after a careful review of our authorities, it is said by MONTGOMERY, J. : "It is undoubtedly the law in North Carolina that an office (not created by the Constitution) can be abolished, and that as a result the officer loses his office and the property in it. This is no breach of the contract on the part of the State. The holder accepted the office subject to this contingency. No one would contend that because an office was in the estimation of the Legislature useful and necessary at the time of its creation, such an office would continue to be forever a public necessity. If an office once useful should become useless and an unnecessary charge upon the people, it is not only a right of the Legislature to abolish it, but it is its duty to do so. And, as we have said, every man elected or appointed to an office created by the Legislature takes it with the implied understanding that the continuance of the office is a matter of legislative discretion, the office depending upon the public necessity for it. In *Hoke v. Henderson*, 15 N. C., 1, it is said that it may be quite competent to abolish an office and true that the property of the office is thereby of necessity lost. Yet it is quite a different proposition that, although the office be continued, the officer may be discharged at pleasure and his office given to another ; the office may be abolished because the Legislature deems it necessary."

The latest case, *Ward v. Elizabeth City*, 121 N. C., 1, says:

"The city attorney authorized for the new corporation is an entirely distinct office from, and is not a continuation of the office of city attorney of the corporation which was extinguished by Act of the Legislature.   This case differs from *Wood v. Bellamy,* 120 N. C., 212, in that, there the new charter was so nearly a repetition of the old one that it was held to be merely an amendment of the former one, not a destruction of it, and hence the offices under such charter were not vacated.   Every one who accepts an office created by legislative enactment takes it with notice that the legislature has power to abolish his office, and is fixed with acceptance of all provisions in the Act creating the office." FURCHES, J., in *McDonald v. Morrow,* 119 N. C., 666 (top of page 677) says: "The only restriction upon the legislative power is that after the officer has accepted office upon the terms specified in the Act creating the office, this being a contract between him and the State, the Legislature can not turn him out by an Act purporting to abolish the office, but which in effect continues the same office in existence."

*McDonald v. Morrow,* supra, and other cases to like purport are cited in *Caldwell v. Wilson* (by DOUGLAS, J.), 121 N.C., 425, see pages 468, 469, especially lines in italics on p. 468.

So that the only question is, whether the office of Superintendent has been actually abolished, as the law-making power unequivocally has said, or shall we hold that it has been guilty of subterfuge and has really continued the office, in another name, and in fact and in truth merely transferred its duties and emoluments to another ?  Is the office of Superintendent to-day in existence under another name ?  If not, judgment must go against the defendant.

In *Wood v. Bellamy, supra,* there was no radical change in the method of management, no destroying and repeal of previous acts as in the present case, but the new legislation

on its face purported to be, and was in fact, a mere amendment to previous legislation; the name of the institution and of the offices was somewhat changed, but it was clear that there was the same system of management, and the same offices with the same functions, the labels being changed. This being so, the Court held, following *Hoke v. Henderson,* that the office, being in truth continued in existence, the officer could not be dispossessed. In *Ward v. Elizabeth City, supra,* a still later case (September Term, 1897) it was held that where a city charter was abolished and a new corporation created with enlarged territory, it was such a change that the city attorney under the old charter could not claim his salary under the new. The change made by the Act before us is far more searching and complete than that sustained in Ward's case. The entire government of the penitentiary, as provided by the Act of 1897, is abolished root and branch, not only the "one-man power" which dominated under the Act of 1897 is swept away, but a new system of government thereof is established by a Board of twenty-one Directors, in which the old office of Superintendent not only does not exist, but such office is totally incompatible in every particular with the new form of government provided by the legislative will.

A review of the methods of government provided for the Penitentiary will be instructive. Under the Laws of 1879, Ch. 333 and 1881, Ch. 289, the Penitentiary was governed by a Board of five Directors. In 1885, Ch. 524, the number was increased to nine. In 1889, Ch. 524, the number was again reduced to five, and this continued until 1893. So that from 1879 to 1893 the office of Superintendent was not a *sine qua non* in Penitentiary management. It simply did not exist. Just as the Legislature of 1899 has declared, it does not exist to-day. In 1893, Chapter 283, a new system was inaugurated. The office of "Superintendent of the State's Prison"

was created. In 1895, Chapter 417, this system was abolished and a return had to the old system, but it failed to take effect because the Board of nine Directors therein provided for were elected by the Legislature when no quorum was present, and in consequence of the decision in *Stanford v. Ellington,* 117 N. C., 158, there was no contest over the matter and the Superintendent held on for the lack of any one to succeed him. In 1897, Chapter 219, there was a return to the "one-man power" provided by the Act of 1893. In 1899, this system, not having worked satisfactorily, the Legislature returned to the old system which had obtained from 1879 to 1893, and abolished by express enactment, root and branch, the opposite method of government which had been attempted by only two Legislatures (1893 and 1897), the tho other nine Legislatures, from 1879 to 1899 inclusive, having approved the system of government by a Board.

The argument for the defendant is that the Penitentiary must be governed by the discharge of substantially the same duties by some person or persons, and, therefore, though the office of Superintendent is abolished and not reestablished either in form or in any other name, yet as those duties must be performed by the Board itself, and agents appointed by it, therefore the office of Superintendent is still in existence, no matter how it is divided up; that as the duties exist therefore the office exists, and the defendant must have it and its emoluments. This is the fallacy of his argument. The office does not exist either potentially or colorably. No one exercises it or draws its emoluments. The Legislature had power to abolish it, and it has done so in unmistakable language, and we must take it that they have done so in good faith. *Wood v. Bellamy* says the officer is entitled "so long as the office exists," not so long as the same duties must be performed by some one in some way. The duties of management remain

and the Legislature has apportioned those duties as it thought best. If the office of Superintendent is necessarily beyond annihilation unless the Penitentiary itself is annihilated, where was it in hiding from 1879 to 1893? There is a wide distinction between the office of Superintendent with certain fixed duties prescribed by the Legislature which can not be taken from the incumbent as long as the office is continued (or if it is only colorably, not truly abolished) and the duties of managing the Penitentiary which remain substantially the same under every form of government, however much the Legislature as representatives of the Sovereign people may change the method of its government. The functions of government remain substantially the same under an absolute monarchy in Russia as in a free country like ours, but should Russia come to be administered by the elected representatives of its people, the office of Czar would cease to exist. The powers and duties of absolute sovereignty would remain.

By the Act of 1897, Chapter 219, creating the office of Superintendent of the State's Prison, under which the defendant claims, there was a Board of nine Directors, who had (section 3) "general supervision of the State's Prison or Penitentiary, and of the employment of all convicts sentenced to imprisonment therein by the Courts of the State." Then, by section 4, there was created a middle-man, a Superintendent, with large powers, which he was to exercise under the general supervision of the Directors, as provided by section 2, including the power to appoint all subordinates (169 in number it seems) and fix their salaries, but his appointments and adjustment of salaries were subject to approval or rejection by the Board (section 7) and he was required to make itemized reports which were subject to their approval, and he was allowed a salary of $2,500.

The experience of this system of government, not having

made it acceptable to the Legislature, the Act of 1899 abolished the middle-man and his salary of $2,500, and required the Board of Directors to govern the Penitentiary by direct contract with the subordinates and not, as under the Act of 1897, through the medium of a Superintendent with powers prescribed by the Legislature not to be changed by the Board and he himself not removable by them. No such office or powers now exist. The Board of Directors are to appoint all subordinates themselves and fix their salaries in the first place and discharge all other duties of general supervision directly, instead of at second-hand, by approving or rejecting the appointments, actions and reports of a Superintendent, as under the Act of 1897. The office of middle-man or Superintendent, having proved expensive and unnecessary (*Wood v. Bellamy, supra*), the Legislature in its wisdom abolished it, and no vestige of it remains. It is true the Penitentiary must be governed, but not necessarily by a Superintendent. It is none the less abolished because the Board shall discharge their duties hereafter directly instead of supervising the discharge of them through a Superintendent. To provide for the increased burden of direct supervision, the Board was increased from 9 to 21, and an executive committee of three was provided to be selected by the Board among its own members, who are to meet twice a month, to act for and in behalf of the full Board between its sessions, with its acts subject to approval by the full Board. In all this, there is surely no indication that there has been any subterfuge practiced by the Legislature or that the office of Superintendent is still in existence. If we were disposed to charge a co-ordinate department with subterfuge, we must recall that there sat in that body fifty-five lawyers, among them many of the most eminent members of the profession, thoroughly acquainted with the decisions of the Courts, and that if there had been subter-

124—25

fuge it was not unintentional, but deliberate. Certainly it does not appear upon the face of the statute, and we can not presume bad intentions in the Legislature. *Angle v. R. Co.,* 151 U. S., 18. In *Wood v. Bellamy* the Act on its face was an amendatory Act, and there was no subterfuge, but simply a naive attempt to vacate offices by merely changing their titles. The Court held that would not do, and the Legislature of 1899 had knowledge that nothing less than an actual abolition of an office would vacate it. The office of Superintendent is not only expressly abolished, but, as above said, its very existence is incompatible with the very essence of the new government prescribed, which is by the Board itself without any intermediate, as heretofore, to make contracts, appointments and regulations. It is not the case of "the same old horse under a new blanket." Admittedly, the Legislature had power to abolish this office. It could not possibly have done so more completely, unless it had abolished the Penitentiary itself.

If because the Penitentiary must continue to be managed, the office of one who formerly discharged some of the functions of management can not be abolished, then if he had been charged with the full and entire management he could not be touched during his term, however long, since those functions would necessarily be performed by those placed in charge, and the unbroken line of decisions that all offices created by the Legislature can be abolished by the Legislature is misleading, except as to those minor places which are held in institutions which can themselves be abolished. This is to make an office which is purely an incident in carrying out the legislative will in managing State institutions, the chief thing to be protected at all hazards, and makes the legislative judgment as to the best interests of the institution a secondary consideration. As to the State's Prison, the asylums, the Uni-

versity, schools and the like, which the Constitution or the public necessities require to be continued in existence, an officer once in, no matter how unsatisfactory the system or the officer himself, would be protected as fully as if appointed under and his term fixed by the Constitution. The rat can only be gotten out by burning down the barn.

We know not from the record what mismanagement, if any, caused the Legislature to abolish the system of governing the Penitentiary through a Superintendent, nor is it necessary there should have been any. The Legislature, representing the sovereignty, could change the method of governing any State institution at will. It does appear upon the face of the complaint that the defendant has in possession $200,000 of State's property; that he will (if still in office) handle $100,000 of State's funds annually; that he is insolvent and has given only a $5,000 bond. None of these allegations are denied in the answer, and some of them are expressly admitted. While there is no charge of mal-administration against the defendant (who came in less than a month before the Act abolishing the office), the Legislature may well have thought that a system which admitted of that method was not business-like or safe, and, if they did, it was in their power to abolish it, and it is not for the Courts to forbid it and take the responsibility of restoring that state of things.

If the defendant is protected in a four-years' term, unless the Penitentiary itself is abolished, then, as has already been pointed out, a Legislature which is elected to sit sixty days may fill all the institutions of the State, which from their nature can not be abolished, with officers, holding not four years, but ten years or twenty-five years or fifty years, or for life, and thus tie the hands of future generations and prevent any betterment, as is attempted by this Act, in the mode of administering our great State institutions. Nay, more, it

may elect boards for life and provide that they may themselves, from time to time, fill vacancies in their own body, a right which would be a part of their offices, and thus take the government of the State institutions entirely out of the hands of the people, who will be powerless to free themselves "from the body of this death," through future Legislatures. It is true, it may be said that if the Legislature acts thus unadvisedly and extremely the Courts can not correct its faults. That is true. If the Legislature acts unadvisedly their errors must be corrected, not by the Courts, but by the people in the election of subsequent Legislatures, and it is not for the Courts to limit the corrective process in the hands of subsequent Legislatures. If the Act of 1897 seemed evil to the people, it was for them to send a Legislature here in 1899 to correct it, and if this Act of 1899 is not approved by popular opinion, a Legislature will be sent here in 1901 to change it. The Courts have no supervisory power, nor veto, upon legislation.

The theory of all free government is that the people are to administer their own affairs in their own way. No Legislature elected for two years can pass any Act whatever which is not revocable by a future Legislature, and this is as true when it creates an office as in any other case. When the Supreme Court of the United States, in an unfortunate hour, held in the Dartmouth College case that a charter of a corporation was not a privilege, but a contract, and therefore irrevocable, the immense, the overshadowing danger that one weak or corrupt Legislature could bankrupt a Commonwealth for all time and tie the hands of unborn generations, caused every State, including our own, to revert to first principles by placing in its Constitution the provision that all charters should be revocable at the will of any future Legislature. When the decision by the same tribunal of the case of *Chis-*

*holm v. Georgia* showed the danger of a State being sued by reason of contracts made by its Legislature through unwisdom or corruption, Judge Iredell of North Carolina, then on the Supreme Court of the United States, gave the alarm through his dissenting opinion, and there was forced through with great promptness the Eleventh Amendment to the United States Constitution, whereby any future Legislature could say whether it would be bound by the Acts of its predecessor by forbidding any suit against a State to enforce rights accruing under any legislation by the State—an amendment which alone saved North Carolina from the terrible oppression of an indebtedness of $36,000,000, incurred without consideration in 1868. When the Legislature of 1833, without deep foresight into the future, attempted to give immunity from taxation for all time to the Wilmington & Weldon Railroad Company, and the Company claimed that thereunder it could build lines into every county in the State, and be everywhere, and forever exempt from contributing by taxation to the support of the State, it was this Court in *Railroad v. Allsbrook,* 110 N. C., 137 (at pages 145–148) which protected the public from a great and lasting injustice by declaring the incompetence of one Legislature thus to bind future generations, and thus placed the vast property of that corporation on the tax list—a decision which was affirmed by the Supreme Court at Washington.

In all our sister States it is held that legislative offices are not contracts, but mere agencies of the State, and revocable by the Legislature without any restrictions. Meechem Pub. Offices, section 463; 19 Am. & Eng. Enc. 562c; Black Const. Law, 530; Black Cons. Prohibitions, section 95; Cooley Const. Lim. (6th Ed.), page 331, and numerous cases cited by each. Our State alone of the forty-five modifies this *(Hoke v. Henderson, supra),* but only to the extent that

while the Legislature can at will abolish such offices or reduce the salary or increase the duties, it can not remove the incumbent while the office is continued—a modification which has entailed upon this State a large class of litigation which is unknown everywhere else. That case, however, also distinctly holds (bottom of page 21) that "property" in the office is the right to its compensation, and that in offices without pay the incumbent can be removed and a new officer installed, though the office be not abolished. It logically follows that if the incumbent of a paying office is removed while the office is unrepealed his remedy is not reinstatement in the office, but damages for the loss of his property rights—"the transfer of the emoluments" of the office, as it is there styled. As to offices not placed under the protection of the Constitution, as to their terms and compensation, the organic law has purposely left them to be made, modified or unmade, as the people through their Legislature may deem best for the public interest. Neither *Hoke v. Henderson* nor any subsequent case has come within sight or hailing distance of the defendant's contention that an office created by one Legislature can, in no exigency, whatever the urgency or the manifest wisdom of the step, be abolished by another, unless the institution to which it is attached is abolished, for this is his naked contention, stripped of its superfluities, if it is true, that inasmuch as essentially the same duties in carrying on the institution must be performed, therefore the office is still in existence.

If this be sound doctrine, it is an absolutely new doctrine, and there is a paradise ahead for legislative office-holders, who, like Milton's fallen angels,

> ."Can only by annihilation die."

The decision in this case is the opposite of the Civil Service which obtains in the Federal Government and in many of the States. That permits the removal of the heads of depart-

ments, through which means the policy of government is changed at will, but protects the subordinates, who are appointed and retained for merit. This forbids the change of the heads and leaves the subordinates removable at will. Besides, Civil Service laws are sustained so long only as the people endorse that system by re-electing Legislatures and Congresses in its favor. It is not beyond legislative action, as the defendant contends that he is. If the office is abolished, of course the defendant is entitled to no salary, but even if the Court could hold that the defendant is still in office after the Legislature has decreed its abolition, "no money can be drawn out of the State Treasury except by authority of law." There is no law allowing the defendant any salary. It is expressly repealed. In *"Hoke v. Henderson"* it is said that unless it could be seen that the object was to starve the officer out, the Act could not be held unconstitutional, and no such intent is here shown, for if it is true, as defendant contends, that his office has been divided among twenty-one Directors, who are discharging, as he says, the functions he formerly discharged, and he must reassume it from them, then he is only entitled to the salary allowed them as his substitutes, and it would take an expert accountant to state how much of the salary allowed them is for the duties devolved upon them before the abolition of the middle-man, and how much is added by reason of dispensing with his services, for it is unquestionable law that the Legislature can at will reduce the salary of any officer, the reduction of whose compensation is not forbidden by the Constitution. In *Hoke v. Henderson* it is further said (15 N. C., at bottom of page 27) that if the Legislature should refuse salaries to officers elected by it, the office remaining still in force, "while such Act would be unconstitutional, the Courts could give no remedy, but it must be left to the action of the citizens to change unfaithful for

more faithful Representatives." Even if the Court could hold that the removal of the defendant was unconstitutional, it is expressly held in the late case of *Garner v. Worth,* 122 N. C., 250, that no Court could enforce the payment of any salary to him, most especially when, as here, the sovereign acting through the Legislature has forbidden it. This is true as to an admittedly valid State bond under the Great Seal, which is certainly of as high dignity as a salary which the Legislature has expressly forbidden to be paid, which therefore the Treasurer can have no power to pay and the Courts can give him none. He holds the people's money to be paid out only when the Legislature directs. The Courts can only issue a *mandamus* to the Treasurer when the statute directs payment, never when the statute is silent, and certainly not when it forbids payment.

In *Cotten v. Ellis,* 52 N. C., 545, the Court puts its decision expressly on the ground that the office was created by the United States Government, and therefore, unlike a legislative office, the State could not abolish it, and added that if they were to give a *mandamus* to pay the salary, they were not sure they could enforce it. In *Garner v. Worth, supra,* it is held the Court can not except where the salary is prescribed by the Constitution. In *Bailey v. Caldwell,* 68 N. C., 472, also, the decision rested upon the ground that the office, having been created by the Constitutional Convention, the Legislature could not abolish it.

If the defendant is entitled to any salary it is an equitable part of that allowed those he asserts are the incumbents placed in his office. It is the new salary, not the old one, to which he is entitled.

Besides, if the defendant had been Superintendent of a private corporation under a four-years' contract and he was without cause discharged therefrom, no Court would reinstate him in office; his remedy would be to recover as damages the

salary for the unexpired time, reduced by whatever he made or ought to have made at his regular vocation during that time.   There is no decision holding that this is not the remedy of a legislative office-holder who is evicted illegally.   It must be so, for the ground of his right is placed by *Hoke v. Henderson* expressly on contract, and the contract in his favor is only as to the emoluments, and for breach of contract the measure of damages is the same as to an individual and the State—the difference being solely in the procedure, which in the latter case must be by petition in the Supreme Court. The State can not be at greater disadvantage than a private corporation or an individual.   It is different as to an office created by the Constitution, for that does not rest on contract (Cooley Const. Lim. and Black Const. Law, *supra*), but the Legislature is simply prohibited from meddling with it.   Except where restrained by the Constitution, the Legislature is all powerful as the representative of the people.  As was well said by FAIRCLOTH, C. J., in *Ewart v. Jones*, 116 N. C., 570 (since cited with approval by DOUGLAS, J., in *Caldwell v. Wilson*, 121 N. C., 470) : "Under our form of government the sovereign power resides with the people and is exercised by their representatives in the General Assembly.   The only limitation upon this power is found in the organic law as declared by the delegates of the people in convention assembled."   There is no constitutional inhibition upon one Legislature abolising an office created by the Legislature, except the restraint read into the Constitution by *Hoke v. Henderson*, that while the Legislature can abolish, it can not give the emoluments of the office to another if it is continued in existence.   This rests solely upon the ground that to do so would be a breach of contract.   As such, there can logically be no remedy by reinstatement, but simply by a proceeding for damages, the measure thereof to be ascertained as in case of any private individual or corporation.

The line of decisions, like *McKee v. Nichols,* 68 N. C., 429, that all appointments to office must be by the Governor was rendered null and is now obsolete, as to offices created by statute, by virtue of the amendment to the Constitution in 1875. *Ewart v. Jones,* 116 N. C., 570.

In making laws, the Legislature is acting within their exclusive province and discharging a duty for which they have been elected. It is a cardinal principle that the Courts can not enter the legislative department and set aside a law they have made, unless it is clearly in conflict with the Constitution. "If there is any reasonable doubt it will be resolved in favor of the lawful exercise of their powers by the representatives of the people." *Sutton v. Phillips,* 116 N. C., 502. To do more than this would be usurpation by the Courts.

On a careful review it would seem that the ruling of his Honor below was in every particular a just and true declaration of the law under all our previous decisions, to-wit: "That the office of the Superintendent of the Penitentiary created by the Act of 1897 has been abolished by the Act of January 26, 1899; that said office has not been substantially reestablished in another form, nor has its emoluments, powers and duties been conferred on others for the purpose of ousting the defendant; that by the Act of January 26, 1899, the General Assembly has made a radical change in the method of managing and conducting the penal institutions of the State, which it was clearly within the scope and power of the legislative department to do, and that said Act creates a corporation with all necessary and sufficient powers to carry into effect the purpose of the Act," and should be affirmed.